```
           IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
                   EASTERN DIVISION

              Case No. 2:23-cv-4102

                      - - -
```

DEREK J. MYERS, ET AL.,

                         plaintiffs,

V.

PIKE COUNTY, ET AL.,

                         defendants.

## DEPOSITION OF JOSHUA CARVER

The deposition of Joshua Carver was taken on Thursday, August 29th, 2024, at 1:22 p.m., at the Pike County Government Center, 230 Waverly Plaza, Waverly, Ohio.

Joshua Carver
August 29, 2024

Page 2

1  ON BEHALF OF THE PLAINTIFFS:
2         Marc D. Mezibov, Esquire (via Zoom)
          Mezibov Butler
3         615 Elsinore Place, Suite 105
          Cincinnati, Ohio 45202
4         mmezibov@mezibov.com
5         Emmett E. Robinson, Esquire
          Robinson Law Firm LLC
6         6600 Lorain Avenue, Suite 731
          Cleveland, Ohio 44102
7         erobinson@robinsonlegal.org
8
9
   ON BEHALF OF THE DEFENDANTS:
10
          Cassaundra L. Sark, Esquire
11        Lambert Law Office, LLC
          215 South 4th Street
12        Ironton, Ohio 45638
          csark@lambert-law.org
13
14
15
   ALSO PRESENT:
16
          Derek Myers (via Zoom)
17
18
19
20
21
22
23
24

Page 3

1                      INDEX
2  EXAMINATION                                PAGE
3  Mr. Robinson                                  4
4
5
6
   EXHIBITS                                   PAGE
7
   Exhibit 14                                   10
8  Exhibit 15                                   14
   Exhibit 16                                   19
9  Exhibit 17                                   40
10
11
12
13 Stenographer's Certificate                   51
14
15
16
17
18
19                        - - -
20
21
22
23
24

Page 4

1              JOSHUA CARVER,
2  being by me first duly sworn, as hereinafter
3  certified, deposes and says as follows:
4                   EXAMINATION
5  By Mr. Robinson:
6       Q.   Good afternoon, Lieutenant Carter.
7       A.   Carver.
8       Q.   Carver.  I'm sorry.  And it is lieutenant
9  now; right?
10      A.   Yep.
11      Q.   Have you been deposed before?
12      A.   Not in years.
13      Q.   Okay.  So I'll go over some of the basic
14 ground rules that are -- I don't do this very often
15 either.  So good for me to remember too.  One is we
16 got to try not to talk over each other.  And I have a
17 bad habit of talking, you know, conversationally when
18 I get into these, and I talk too fast for the court
19 reporter.  So we'll try to not talk over one another
20 and try to speak somewhat slowly.  That would be
21 great.
22           Your counsel, you know, is free to raise
23 objections to any question I ask.  Generally after
24 she objects, you still have to answer unless she

Page 5

1  instructs you not to answer.  So generally that's
2  just if there's attorney-client privilege, which I
3  don't anticipate will be happening here.  But just so
4  you know that.
5            It's best to give audible answers.  So,
6  you know, affirmative "yes" or affirmative "no."
7  Just like in court.  Because, obviously, the court
8  reporter can't pick up head nods and "huh-uhs" or
9  "uh-huhs" very well, even though she has to put that
10 one in there now, I guess.
11           Can you please tell me where you work?
12      A.   For the Pike County's Sheriff's Office.
13      Q.   And how long have you worked there?
14      A.   Since October of 2016.
15      Q.   And you said that you are currently a
16 lieutenant; is that right?
17      A.   Yes.
18      Q.   When did you receive that promotion?
19      A.   Beginning of -- well, December, I think,
20 of last year.
21      Q.   Okay.  And then you were a sergeant
22 before that; is that right?
23      A.   Yes.
24      Q.   How long were you a sergeant, if you can

Joshua Carver
August 29, 2024

Page 6

1  remember?
2   A.   Year, year and a half, maybe.
3   Q.   Okay. And as a lieutenant, where do you
4  fall in the pecking order? Let me rephrase that.
5  How many other lieutenants are there?
6   A.   Two other lieutenants.
7   Q.   And directly above you your supervisor
8  would be the captain; is that right?
9   A.   Technically, yes.
10  Q.   Technically. Okay. What makes you
11 hesitate there?
12  A.   I currently run our corrections division.
13  Q.   Okay.
14  A.   So I report, basically, to the chief
15 deputy at this point.
16  Q.   To the chief deputy. And could you tell
17 me what his name is?
18  A.   Chris Jones right now.
19  Q.   And previously it was Mr. Dixon; is that
20 right?
21  A.   James Dixon.
22  Q.   James Dixon. And, of course, the chief
23 deputy reports to the sheriff; is that right?
24  A.   Yes.

Page 7

1   Q.   Okay. So I want to start out with -- I
2  think most of this will be pretty basic. But I just
3  want to make sure that we agree where we agree and
4  disagree where we disagree. So I wanted to show you
5  this document. The numbering's going to be confusing
6  because I'm going to try to use the same numbering as
7  this morning to make it easier for our court
8  reporter. But this is going to be Exhibit No. 9.
9  And could you tell me what that document is?
10  A.   It is part of our incident report forms.
11  Q.   And can you tell me who the suspect is on
12 this form?
13  A.   It is Derek Joel Myers -- Myers. Sorry.
14  Q.   Now, I have some very basic questions
15 about this just to make sure I understand how it
16 works. So see up top in the administrative box
17 you've got a "TOD" there and then a date. Do you
18 know what that "TOD" stands for?
19  A.   "Time of dispatch" or time it was
20 provided.
21  Q.   Okay. Okay. And that says October 28th,
22 2022; right?
23  A.   Uh-huh.
24  Q.   And it says 17:59. So 5:59 p.m.?

Page 8

1   A.   That's correct.
2   Q.   Okay. And then the "TOA" in the next
3  box, what does that mean?
4   A.   "Time of arrival."
5   Q.   Oh, okay. So the TOD is that basically
6  when you receive notice of the offense or the alleged
7  offense or however you want to put it?
8   A.   It's the time that I notified or someone
9  notified dispatch of that offense.
10  Q.   Okay. And then time of arrival would be
11 when you -- this is a strange situation I realize
12 because it's not like you're going somewhere to
13 respond to an emergency or something.
14  A.   Right.
15  Q.   But when you, I guess, actively take on
16 the case for lack of a better word?
17  A.   It's when they actively start to put it
18 into the computer or it's logged in with our office
19 that way.
20  Q.   Okay. And then -- so the next one is
21 "TOC." What's that one?
22  A.   "Time of clearance."
23  Q.   Okay. And what does that mean?
24  A.   The time that this report through

Page 9

1  dispatch has been cleared.
2   Q.   Put together?
3   A.   Cleared with them.
4   Q.   Okay. Okay.
5   A.   Yeah.
6   Q.   So who would have put this report
7  together initially?
8   A.   This initial one would be me.
9   Q.   Okay. And then there's a -- on Page 2
10 there are two narrative boxes. You see that?
11  A.   Uh-huh. Sorry. Yes.
12  Q.   The first narrative -- good job. I
13 didn't catch that. The first box has a narrative
14 date of October 28th, 19:26; is that right?
15  A.   Yes.
16  Q.   So 7:26 p.m.?
17  A.   Yes.
18  Q.   And it says "Joshua Carver." So you
19 would have done that sentence of narrative right
20 above that; right?
21  A.   Yes.
22  Q.   Okay. Same deal with the one below that.
23 That came a lot later, December 19 of '23; right?
24  A.   Yes.

Joshua Carver
August 29, 2024

Page 10

1  Q.  And you are the author on that one
2  right -- as well; right?
3  A.  It looks so.  Yes.
4  Q.  Sure.  Take your time and read over it if
5  you want.
6  Okay.  So you're comfortable saying that
7  you're the author of that one?
8  A.  I believe so, yes.
9  Q.  Okay.  Let's keep this out but kind of
10  put it to the side.  I'm going to ask you to juggle a
11  couple different papers at once.  So next one I know
12  you've seen but it's probably a long time.  And I'll
13  mark this as Exhibit 14.
14           - - -
15  (EXHIBIT NO. 14 WAS MARKED.)
16           - - -
17  Q.  I'm sorry.  I'm going to switch you out.
18  And I'll represent to you that Exhibit 14 is a
19  printout of an article printed on the -- from the
20  Scioto Valley Guardian News website.  Does it look
21  like it's that to you from what you can see here?
22  A.  Yes.
23  Q.  Okay.  And the author on the byline is
24  Derek Myers; is that right?

Page 11

1  A.  Yes.
2  Q.  And the date is October 28th, 2022; is
3  that right?
4  A.  All right.
5  Q.  It's in tiny print right next to his name
6  on the -- right on there --
7  A.  Oh, yeah.  The bifocals are getting
8  worse, but yes.
9  Q.  Okay.  You have seen this article before;
10  is that right?  Maybe not in a printed form but in an
11  electronic form?
12  A.  Yes.
13  Q.  Okay.  Could you tell me about how you
14  came to learn that this article existed?
15  A.  I had a verbal contact from an individual
16  that asked me if I had seen and heard the information
17  that had been posted on the Scioto Valley Guardian.
18  Q.  Okay.  And who was that individual?
19  A.  At that time it was a family member of
20  mine.
21  Q.  Okay.  Did that family member work for
22  the sheriff's department?
23  A.  No.
24  Q.  Was he or she employed by any arm of the

Page 12

1  Pike County government?
2  A.  No.
3  Q.  Was it an immediate family member?
4  A.  Yes.
5  Q.  Okay.
6  A.  Not in-house family member, if that's
7  what you mean.  It was a -- it was my parents.
8  Q.  Okay.
9  A.  They were proud because my picture was in
10  the article.
11  Q.  Very nice.  Which one are you there?
12  A.  Yes.
13  Q.  Oh, you're covered by that thing on the
14  printout?
15  A.  Yeah.  But that's just it.  They were --
16  Q.  Got it.  So that was published on
17  October 28th; right?
18  A.  Yes.
19  Q.  And this incident report, likewise, you
20  put this together on October 28th as well; right?
21  A.  Yes.
22  Q.  So presumably right after or shortly
23  after you found out about this article, you put
24  together this incident report; is that right?

Page 13

1  A.  Yes.
2  Q.  Okay.  And I would ask you to look at the
3  second page of the article, the second paragraph.
4  Sorry this print is small.  But it starts out and it
5  says, "Jake Wagner chose not to be video or audio
6  recorded by the news media"; is that right?
7  A.  Yes.
8  Q.  And as far as you know, that's correct,
9  isn't it?
10  A.  Yes.
11  Q.  And there was a court order in place that
12  the media could not audio or video record if a
13  witness objected to that; is that correct?
14  A.  And there was a court order prior to that
15  that none of it can be done, but yes.  Jake also
16  signed his release stating he did not want his
17  recorded.
18  Q.  Okay.  And then if we could look at the
19  next paragraph, it says "The Guardian received a
20  portion of Jake Wagner's testimony on his first day
21  on the witness stand.  The Guardian wants to disclose
22  that the audio was not recorded by a media of the
23  media and was submitted to the Guardian's newsroom by
24  a courthouse who is authorized to have their cell

Joshua Carver
August 29, 2024

|  | Page 14 |
|---|---|
| 1 | phone in the room." |
| 2 | Did I read that correctly? |
| 3 | A. Yes. |
| 4 | Q. Okay. So if you could hold onto that |
| 5 | article but kind of put it to the side for a second. |
| 6 | Pull out one more exhibit. This will be the last one |
| 7 | that I'll ask you to like at simultaneously. So this |
| 8 | will be Exhibit 15. |
| 9 | - - - |
| 10 | (EXHIBIT NO. 15 WAS MARKED.) |
| 11 | - - - |
| 12 | Q. And this is just a copy of the Ohio |
| 13 | Revised Code section at issue. So I'll mark it here. |
| 14 | If you look down at A3, that statute. I guess let's |
| 15 | go up to the top. Letter A says, "No person shall |
| 16 | purposely do any of the following." Down to Number |
| 17 | 3, it says, "Use or attempt to use the contents of a |
| 18 | wire, oral, or electronic communication." |
| 19 | So let's stop there. So the use at issue |
| 20 | here, I'm assuming, would be the publication of this |
| 21 | article with the audio attached to it; is that right? |
| 22 | A. It would be the use of the wire |
| 23 | recording. |
| 24 | Q. Right. No trick there. |

|  | Page 15 |
|---|---|
| 1 | A. I wouldn't say publication. It's -- he |
| 2 | used the recording. |
| 3 | Q. Right. Okay. So that's one element of |
| 4 | it. And it also says "Knowing or having reason to |
| 5 | know that the contents were obtained through |
| 6 | interception of a wire or electronic communication in |
| 7 | violation of" -- and then it lists specific sections |
| 8 | of the revised code; is that right? |
| 9 | A. Yes. |
| 10 | Q. And so your position would be, I believe, |
| 11 | not trying to put any words in your mouth, correct me |
| 12 | if I'm wrong, that's satisfied here because he used |
| 13 | this recorded via publishing it. And it was the -- |
| 14 | whoever initially recorded it obtained it in |
| 15 | violation of the court order; is that right? |
| 16 | A. There you -- yes. |
| 17 | Q. So those are the two elements. Okay. So |
| 18 | if we go back to your first document here, the |
| 19 | incident report. Again, this is all basic. I'm not |
| 20 | trying to play stupid. I just want to make sure that |
| 21 | we're all on the same page so far. So if we look on |
| 22 | the offense block here. Offense. And you have it |
| 23 | listed here -- so this is a section of the revised |
| 24 | code; is that right? |

|  | Page 16 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And it's 2933.52A3; is that right? |
| 3 | A. Yes. |
| 4 | Q. And does that correspond with the section |
| 5 | of the revised code that we just looked at? |
| 6 | A. Yes. |
| 7 | Q. And that in turn corresponds with the |
| 8 | elements as you saw them or believed you saw them in |
| 9 | the Scioto Valley Guardian article at issue; right? |
| 10 | A. In one of his places that he posted it, |
| 11 | yes. |
| 12 | Q. Sure. Sure. And so I should say I'm not |
| 13 | suggesting that this was necessarily the only |
| 14 | instance of a purported A3 violation. So when you |
| 15 | say elsewhere, what do you mean? |
| 16 | A. He also posted it on his personal |
| 17 | website. |
| 18 | Q. Okay. |
| 19 | A. And on his Facebook page. |
| 20 | Q. Okay. And looking back at Exhibit 9, the |
| 21 | incident report, next to that offense description -- |
| 22 | I'm sorry -- just the offense enumeration of 52A3. |
| 23 | The offense description says the general name of the |
| 24 | statute; right? "Interception of wire or oral |

|  | Page 17 |
|---|---|
| 1 | communication." Then it has a specific violation |
| 2 | here; right? "Purposely disclosed content"? |
| 3 | A. Correct. |
| 4 | Q. Okay. |
| 5 | MR. ROBINSON: Can we go off the record |
| 6 | for just a minute. |
| 7 | (Recess taken.) |
| 8 | By Mr. Robinson: |
| 9 | Q. All right. Lieutenant Carver, just one |
| 10 | or two more questions for you on this incident |
| 11 | report. So also in the offense block we've got kind |
| 12 | of a subsection here that says "Type of criminal |
| 13 | activity"; right? Do you see that about halfway down |
| 14 | on the right? |
| 15 | A. Uh-huh. |
| 16 | Q. And you have the type listed as |
| 17 | "possessing, concealing, and using or consuming"; is |
| 18 | that right? |
| 19 | A. Uh-huh. |
| 20 | Q. I'm assuming again, correct me if I'm |
| 21 | wrong, the theory being that he possessed the |
| 22 | recording when he published it online in these |
| 23 | different contexts; right? Is that right? |
| 24 | A. Yes. |

Joshua Carver
August 29, 2024

## Page 18

```
1    Q.   And then by the same token, when he put
2　it on the Guardian or on his Facebook page, he was
3　using the recording as well; right?
4    A.   Yes.
5    Q.   Okay.  So is it fair to say that the
6　incident report was the first document that was
7　created regarding this investigation?
8    A.   It was started then, yes.
9    Q.   Okay.  But the narrative -- second
10　narrative was added much later; right?
11   A.   Yes.
12   Q.   But the rest of it would have been done
13　at that time?
14   A.   It would have been done near that time.
15   Q.   Okay.  All right.  I'm going to hand you
16　what I have marked as Exhibits 2 and 3.  Exhibit 2 is
17　the first page.  Could you -- did it again.  I gave
18　you the wrong copy.  Could you tell me what that
19　document is?
20   A.   It is an affidavit warrant for probable
21　cause.
22   Q.   For what kind of action?  Can you tell
23　here?  Like, is it an arrest warrant?  Is it a
24　seizure warrant?
```

## Page 19

```
1    A.   It's an arrest warrant.
2    Q.   Okay.  And then Exhibit 3 is the next
3　page of that.  And could you tell me what that is?
4    A.   That is the probable cause affidavit for
5　the arrest warrant.
6    Q.   And whose signature is the affiant on
7　Exhibit 3?
8    A.   That would be mine.
9    Q.   And the date on that is October 31st; is
10　that right?
11   A.   Yes.
12   Q.   And then if we go back to Exhibit 2, the
13　first page, the service date is November 1st; is that
14　right?
15   A.   Yes.
16   Q.   Okay.  So I think I understand this, but,
17　again, I just want to make sure that I do.  When
18　you -- let me back up.  Let me pull up another
19　document.  This will be Exhibit 16.
20              - - -
21         (EXHIBIT NO. 16 WAS MARKED.)
22              - - -
23   Q.   Could you tell me what that is?
24   A.   It is another complaint.
```

## Page 20

```
1    Q.   And who is the signatory on that
2　complaint?
3    A.   That would be me.
4    Q.   And what's the date on it?  Way down at
5　the bottom.
6    A.   October -- well, October 31st.
7    Q.   Of what year?
8    A.   2022.
9    Q.   And who is the complaint against?
10   A.   Derek Joel Myers.
11   Q.   And it is for violation of what section
12　of the revised code?
13   A.   2933.52A3.
14   Q.   All right.  Now, could you help me
15　understand -- we have three related documents here.
16　So we have the criminal complaint, the affidavit of
17　probable cause for the arrest, and the arrest
18　warrant.  So in what order would these documents have
19　been created?
20   A.   I don't know what order.  Well, what
21　number -- letter are we here?
22   Q.   That is Number 16.  Let me put it on
23　there for you.
24   A.   All right.  Number 16 and 3 would be
```

## Page 21

```
1　completed together.
2    Q.   Okay.  So you do those, roughly, at the
3　same time?
4    A.   I do one right after the other.
5    Q.   Okay.  Any particular order there or not
6　really?
7    A.   Normally 3 then 16.
8    Q.   Okay.  So let's look at 3 first.
9    A.   But each officer can interchange which
10　one they do first.
11   Q.   Sure.  No specific rule there; right?
12　Just whatever --
13   A.   No.  They're done at the same time.
14   Q.   Okay.  So let's look real quickly at the
15　affidavit of probable cause for arrest, Exhibit 3.
16　So here the section at issue is Section 2933.52A3; is
17　that right?
18   A.   Yes.
19   Q.   And that's the same as the section that
20　you put on the incident report; right?
21   A.   Got to forgive me.  The print is small.
22　Yep.  Yes.
23   Q.   And it's also the statute that we looked
24　at a minute ago; right?
```

Joshua Carver
August 29, 2024

Page 22
1    A.   Yes.
2    Q.   And the second paragraph of the affidavit
3  of probable cause, it starts out, "On Friday,
4  October 28th, 2022, at around 12:39 hours I was
5  advised that the website, the
6  sciotovalleyguardian.com, had posted an audio
7  recording of the testimony of Edward Jacob Wagner";
8  is that right?
9    A.   Yes.
10   Q.   And so that posting is the use that
11 constituted part of the violation of A3; right?
12   A.   The publication of it?
13   Q.   Yes.  Yeah.  I'm just using the word
14 "post" because it says "post" here.  But either one.
15 Post or publication is the basis for the theory that
16 it was a use of that document -- of that recording?
17   A.   The use of the recording that he
18 possessed?
19   Q.   Yes.
20   A.   Yes.
21   Q.   Okay.  And the next paragraph starts out,
22 "The ability to record the specific witness, Edward
23 Jacob Wagner, was specifically litigated pursuant to
24 a motion filed by the media of which Derek Myers was

Page 23
1  one of the parties represented.  The court ruled that
2  there was no exception that would permit the media or
3  anyone to record the testimony of Edward Jacob Wagner
4  as he was deemed a witness with the same right to
5  object that any other witness would have."
6         Did I read that correctly?
7    A.   Yes.
8    Q.   So that's the other piece of the A3
9  violation; right?
10   A.   Yeah.
11   Q.   It violated the statute generally because
12 it was recorded contrary to the court reporter order;
13 is that right?
14   A.   The court order and him being a witness
15 by the Supreme Court saying that they didn't have to
16 be.
17   Q.   Okay.  And so, again, no -- I'm not
18 trying to play dumb here.  I just want to make sure
19 I've got it right.  So this violation or alleged
20 violation of 2933.52A3 was the sole basis for your
21 probable cause; right?  In other words, you weren't
22 looking at some other statute or something?
23   A.   It was the statute that I looked at, yes.
24   Q.   Okay.  If we could look -- since it's

Page 24
1  part of the same document in Exhibit 2, the warrant,
2  the first page there.  The bond amount there is
3  $20,000?
4    A.   Yes.
5    Q.   Is that right?  Okay.  When this warrant
6  was issued, it would be issued by the judge based on
7  the content of your probable cause affidavit
8  Exhibit 3; is that right?
9    A.   Yes.
10   Q.   Would the judge also look at the criminal
11 complaint, Exhibit 16 or no or not sure?
12   A.   Yes.
13   Q.   Okay.  And if we look quickly at the
14 criminal complaint, there it says, "Derek Joel Myers
15 did unlawfully and purposely use or attempt to use
16 the contents of a wire or oral electronic
17 communication."
18         Not trying to belabor the point, but same
19 thing here; right?  The use in mind is the
20 publication on Facebook and on the Scioto Valley
21 Guardian; is that right?
22   A.   And his personal --
23   Q.   His personal website you mean?
24   A.   Personal Facebook.

Page 25
1    Q.   Okay.  So you have the Guardian's media
2  Facebook and then you have his personal Facebook?
3    A.   Uh-huh.
4    Q.   Okay.
5    A.   Yes.  Sorry.
6    Q.   Good job.  And here too, the same statute
7  at issue; right?  Section 2933.52A3?
8    A.   Yes.
9    Q.   All right.  I'm going to hand you what we
10 have marked as Exhibit 8.  I'm going to write it on
11 there this time.  This is the search warrant and
12 probable cause affidavit related to Mr. Myers and the
13 Guardian's computer.  Just take a look at it and see
14 if it looks like that is, in fact, what it is to you?
15   A.   Yes.
16   Q.   Okay.  And if you go to the last page, so
17 it would be numbered Page 4 of the affidavit, can you
18 tell me whose signature that is?
19   A.   Mine.
20   Q.   And what is the date on that?
21   A.   October the 28th, 2022.
22   Q.   So this is the same day that you learned
23 about the article; right?
24   A.   Yes.

Joshua Carver
August 29, 2024

Page 26
1  Q.   And the same day that you created the
2  incident report?
3  A.   Yes.
4  Q.   You would have --
5  A.   Go ahead.  I'll let you question first.
6  Sorry.
7  Q.   You would have created this affidavit
8  after the incident report; is that right?  In other
9  words, you would start the incident report first and
10 then you would write up the affidavit?
11 A.   All I have to do to start an incident
12 report is call dispatch --
13 Q.   Okay.
14 A.   -- and say I need a report number.  That
15 starts it.
16 Q.   Okay.
17 A.   When I type it up, totally different.
18 Could be a week from now, after the investigation,
19 before the search warrants.  It could be any time.
20 Can't tell you specifically when I typed up the
21 incident report.
22 Q.   Okay.  So let's go over the dates on the
23 incident report, then, up top.  So this is time of
24 dispatch; right?

Page 27
1  A.   Yeah.  That's when I called dispatch.
2  Q.   Okay.
3  A.   And I said I need an incident number.
4  Q.   Okay.  So that would be the 17:59 time?
5  A.   Yes.
6  Q.   And then the next one, time of arrival,
7  so what would that be based off of in this case?
8  A.   I need an incident report.
9  Q.   Okay.  So the simple act of --
10 A.   All of it can be one time and date.
11 Q.   So just you calling would generate all
12 three of these time and dates?
13 A.   Yes.  Yeah.
14 Q.   Okay.  So but we can say -- other than
15 the narrative that was added later -- that the
16 incident report was created before the search warrant
17 affidavit?
18 A.   The call for -- I could have been working
19 on it all at the same time.
20 Q.   Sure.  So it's fair to say it was either
21 before or at the same time?  It's not like the
22 incident report was created after the fact?
23 A.   The report number was created on that
24 date.  I can affirm that.

Page 28
1  Q.   Okay.
2  A.   I can affirm that I signed this on the
3  same date.
4  Q.   Okay.
5  A.   So that means I created that on the same
6  date.  And your other 16, 2, and 3, October the 31st,
7  I can state that I created -- of '22 -- that I
8  created those items.
9  Q.   Okay.  So the first thing we have a time
10 on is the incident report.  And as soon as you
11 learned of the article, is it fair to say that the
12 first of --
13 A.   I may have started my investigation at
14 that point when I learned.
15 Q.   Okay.  So this time stamp on here that
16 says 17 --
17 A.   59.
18 Q.   -- 59 would have been when the
19 investigation started, essentially?
20 A.   No.  That's when I called dispatch and
21 said I need an incident report to start an actual
22 report.
23 Q.   Okay.
24 A.   Doesn't mean that I started -- I could

Page 29
1  have started the investigation -- I'd say most likely
2  it was for when I put on my thing "October the 28th
3  at around 12:39 hours."
4  Q.   Okay.
5  A.   That's probably when I started my
6  investigation.  Because I was informed at that time
7  that it was on these websites.
8  Q.   Okay.  So a little after noon.  So at
9  12:39 in the afternoon, your mom or your dad or
10 whoever gets ahold of you and says "Hey, this
11 article's online."  And you see it.  And you see that
12 this recording is posted as part of it; right?
13 A.   Yes.
14 Q.   Okay.  And then you called dispatch at
15 5:59 p.m. to get the incident report started; right?
16 A.   That's correct.
17 Q.   Okay.  So everything -- is it fair to say
18 that everything is happening relatively quickly?
19 A.   Yes.
20 Q.   So all of the documents that we've looked
21 at so far -- that's not a fair question.
22      So the incident report, the warrant
23 affidavit, were created on the same date; correct?
24 On October 28th?

Joshua Carver
August 29, 2024

### Page 30

1  A. The search warrant affidavit? Is that
2  what you're talking about? Or the arrest warrant?
3  Q. The search warrant affidavit.
4  A. Yes.
5  MS. SARK: That's not the search warrant.
6  It's the -- yep. That's the --
7  Q. Very last page?
8  A. Yes.
9  Q. Okay. Great. Now that -- since you have
10 that open, let's take a look briefly at the search
11 warrant affidavit. So as you pointed at at the top
12 of numbered Page 3, it says "On October 28th, 2022,
13 at around 12:39 hours" --
14 MS. SARK: It's a page before that. Yep.
15 A. Well, that's 8. 3 is the affidavit for
16 probable cause for arrest.
17 Q. Right there.
18 A. Oh, the actual Page No. 3. I was
19 looking --
20 Q. All right. Let me start that over. It
21 starts out by saying "On Friday October 28th, 2022,
22 at around 12:39 hours"; right?
23 A. Yes.
24 Q. So, like you said, that's roughly when

### Page 31

1  the investigation started; correct?
2  A. Yes.
3  Q. All right. And then if you skip down
4  one, two, three, the fourth paragraph, it starts out
5  talking about the audio recording; right?
6  A. Uh-huh.
7  Q. Then at the end of the second line, it
8  says that "The recording appears to have been
9  recorded during Edward Jacob Wagner's testimony
10 during one of the days of October 24th, 25, or 26th
11 of 2022." Did I read that correctly?
12 A. Yes.
13 Q. And it says Derek Myers was seen in the
14 Pike County Court of Common Pleas during this time
15 frame; is that right?
16 A. Yes.
17 Q. So I want to ask you who it was that saw
18 Derek Myers in the courthouse during this time frame?
19 A. I saw him. I worked security on and off
20 throughout the whole Wagner initiative there. And I
21 believe the bailiff saw him.
22 Q. Okay. Do you know that bailiff's name
23 offhand?
24 A. Jason Frazier was one of them.

### Page 32

1  Q. Okay. Jason Frazier. And tell me a
2  little bit more about -- to the extent you recall --
3  which of those dates you were working at the
4  courthouse doing security for the Rhoden trial?
5  A. I worked security every day. I was part
6  of the team that transported. When you saw my
7  picture on Mr. Myers thing, I transported him every
8  day. Transported -- help transport his brother in.
9  Q. Okay. So you would have been at trial --
10 is it fair to say you would have been there every day
11 at trial?
12 A. In and out of the courtroom. Because I
13 also run security at this courthouse. I also run our
14 corrections department. So --
15 Q. So let me ask you this. Would you have
16 been there every day in the morning to get him there?
17 A. To ensure the safety of our inmates
18 getting there, yes.
19 Q. And then every evening at the end would
20 you be to --
21 A. To walk him out. Because I transported
22 him back to his -- well, not Jacob but George
23 Wagner -- I transported him every day in and out of
24 the -- except a few days where I may have been sick

### Page 33

1  for --
2  Q. Sure. The defendant in this case, not
3  the witness.
4  A. Right.
5  Q. Okay. So let me ask you about the top of
6  Page 4 there. So the very next page. It says
7  "Affiant requests a nighttime search warrant"; is
8  that right?
9  A. Yes.
10 Q. And I'm assuming this is the case -- but
11 correct me if I'm wrong, did you do this because this
12 was late in the day?
13 A. Yes.
14 Q. And you wanted to get it done that night;
15 right?
16 A. That's correct.
17 Q. Okay.
18 A. I was going to say, you see the incident
19 was created at 5-something and it was getting dark by
20 5:30.
21 Q. Right. Right. Now, if you go back to
22 the first page of the affidavit for search warrant.
23 So it's the numbered page in the middle of this
24 packet. Yeah. One more page, which this is

Joshua Carver
August 29, 2024

Page 34

1 confusingly Exhibit 5. Doesn't make sense. I know.
2 But just trust me. It's Exhibit 5 and it's paired
3 with Exhibit 8 there. This is an affidavit for a
4 search warrant; right?
5     A.    Yes.
6     Q.    So the computer itself was already in
7 your possession or the sheriff department's
8 possession; is that right?
9     A.    No.
10    Q.    Okay. Where was it at this time?
11    A.    It was in the press room that they had
12 set up at the Pike County Common Pleas Court.
13    Q.    Okay. So it hadn't been seized yet.
14 But, basically, even though this says it's just a
15 search warrant, it's a seize and search warrant
16 essentially?
17    A.    Yes.
18    Q.    Okay. And if we look at the first page
19 of this packet --
20    A.    The actually first page?
21    Q.    That's right. The actual first page.
22 This is the actual search warrant signed by the
23 judge; is that right?
24    A.    Once it circles around to Page 2.

Page 35

1     Q.    Fair enough. Page 1 and 2 together are
2 the actual search warrant signed by the judge; right?
3     A.    Yes.
4     Q.    And that was signed by him at -- on
5 October 28th; right?
6     A.    Yes.
7     Q.    At 19:42 hours; right?
8     A.    Yes.
9     Q.    So 7:42 p.m.?
10    A.    Yes.
11    Q.    So, again, we've got things moving
12 quickly; right? Somewhat shortly after noon you find
13 out about the article; right?
14    A.    Yes.
15    Q.    At 5:59 the incident report is created?
16    A.    Call was -- said that I needed a report
17 number, yes.
18    Q.    And here at 7:42 the judge has already
19 signed the search warrant; right?
20    A.    Yes.
21    Q.    Okay. All right. We're going to hand
22 you what is marked as Exhibits 12 and 13. 12 is the
23 affidavit in support of the search warrant to search
24 Mr. Myers's cell phone. And 13 is the actual

Page 36

1 warrant. If you want to look over those and make
2 sure that I'm telling the truth there, that that's
3 really what those documents are?
4          MS. SARK:    No. You're fine. I just
5 wanted to make sure it was -- it's for the cell
6 phone?
7          MR. ROBINSON:    I made umpteen copies.
8          MS. SARK:    Okay. Thank you.
9          THE WITNESS:    Yes. That's what they both
10 appear to be.
11 By Mr. Robinson:
12    Q.    All right. So let's take a look first at
13 No. 12, which is the affidavit. It's the -- starts
14 on the fourth page of the packet. Yep. Now
15 that's -- now that you've found that, let's go to the
16 last page of that. What is the date on this
17 document?
18    A.    November the 2nd, 2022.
19    Q.    And you did not sign this affidavit; is
20 that right?
21    A.    No.
22    Q.    Who did? Do you know?
23    A.    That looks like Mr. Wheeler's signature.
24    Q.    Is his first name Alan?

Page 37

1     A.    Yes.
2     Q.    Okay. And he is employed how?
3     A.    He is an investigator for the Pike County
4 Prosecutor's Office.
5     Q.    Okay. So if we go back to the page prior
6 to that, I'll represent to you that most of this is
7 taken verbatim from your original probable cause
8 affidavit to search the computer.
9     A.    Yes.
10    Q.    The fifth paragraph down, the final
11 sentence says, "Derek Myers was seen in the Pike
12 County Court of Common Pleas during this time frame";
13 is that right?
14    A.    Yes.
15    Q.    And the time frame referenced, I should
16 have said, is October 24th, 25th, or 26th, 2022; is
17 that right?
18    A.    Yes.
19    Q.    Now, you had said previously that this
20 knowledge came from your personal observations and
21 also from Bailiff Frazier; right?
22    A.    At least Bailiff Frazier.
23    Q.    Does Mr. Wheeler -- did not -- strike
24 that.

Joshua Carver
August 29, 2024

|  | Page 38 |
|---|---|
| 1 | You're aware that it's permissible to use |
| 2 | hearsay evidence in a probable cause affidavit; |
| 3 | right? |
| 4 | A. Yes. |
| 5 | Q. So was it acceptable for Mr. Wheeler to |
| 6 | use hearsay here, your hearsay, Mr. Frazier's hearsay |
| 7 | in making this statement that Derek Myers was seen in |
| 8 | the Pike County Court of Common Pleas during this |
| 9 | time frame? |
| 10 | MS. SARK: Objection to form. |
| 11 | You can answer. |
| 12 | A. Mr. Wheeler works in the Pike County |
| 13 | Common Pleas Courthouse on a daily basis and has |
| 14 | security cameras and monitors in his room. So I |
| 15 | can't say that he did not see him during that time |
| 16 | frame. |
| 17 | Q. Fair enough. And you can't say that he |
| 18 | did see him by the same token; right? |
| 19 | A. Same token, no. But I know that he was |
| 20 | in the courthouse. |
| 21 | Q. Okay. Mr. Myers's cell phone was seized |
| 22 | without a warrant; is that right? |
| 23 | A. I don't know. I was not there. |
| 24 | Q. Okay. If we could take a look at |

|  | Page 39 |
|---|---|
| 1 | Exhibit 13, so the first part of this packet. This |
| 2 | is the search warrant for Mr. Myers's cell phone; is |
| 3 | that right? |
| 4 | A. Yes, sir. |
| 5 | Q. Okay. The second page it's dated |
| 6 | November 2nd, 2022, at 12:14 p.m.; is that right? |
| 7 | A. Yes. |
| 8 | Q. And judge -- is it Moraleja? |
| 9 | A. Yeah. |
| 10 | Q. -- signed it? Okay. So if you go to the |
| 11 | third page, that's the exhibit page of the search |
| 12 | warrant; right? |
| 13 | A. Yes. |
| 14 | Q. And that appears to be a picture of the |
| 15 | cell phone; right? |
| 16 | A. Yes. |
| 17 | Q. Can you tell what's lying beneath the |
| 18 | cell phone? |
| 19 | A. It's a faraday envelope. |
| 20 | Q. Okay. Is it -- |
| 21 | A. That's what I call it. |
| 22 | Q. Sure. |
| 23 | A. Yeah. It's to keep data from being |
| 24 | deleted or -- it stops all signals from entering. |

|  | Page 40 |
|---|---|
| 1 | Q. Sure. So the fact that the cell phone |
| 2 | was taken -- this picture of a cell phone was taken |
| 3 | with a faraday envelope indicates it had already been |
| 4 | seized when this picture was taken; right? |
| 5 | A. When it was taken, yes. |
| 6 | Q. Okay. All right. So I've gone through |
| 7 | all the warrants. And we went over it one other |
| 8 | time, but I just want to make sure, throughout this |
| 9 | your probable cause was based on 2933.52A3 and not |
| 10 | some other statute or section; right? |
| 11 | A. Yes. |
| 12 | Q. Okay. I want to ask you a couple of |
| 13 | things about department policies. And mark this |
| 14 | Exhibit 17. |
| 15 | - - - |
| 16 | (EXHIBIT NO. 17 WAS MARKED.) |
| 17 | - - - |
| 18 | Q. This isn't a complete manual. But this |
| 19 | is how this document was produced to us by the |
| 20 | county. Do you recognize this at all? Does it look |
| 21 | familiar? |
| 22 | A. Yes. It looks like it may have come from |
| 23 | part of our policies and procedures. |
| 24 | Q. I'm guessing you're probably pretty |

|  | Page 41 |
|---|---|
| 1 | familiar with that document? |
| 2 | A. With our policies and procedures, yes. |
| 3 | Q. Not the most exciting thing in the world, |
| 4 | I know. But I want to ask you on numbered Page 276 |
| 5 | it says command of -- I'm sorry -- numbered |
| 6 | Paragraph 6 up at the top. "Command of the warrant |
| 7 | shall be that the search be made in the daytime |
| 8 | unless there is urgent necessity for a search at |
| 9 | night. The reason being stated in the affidavit." |
| 10 | Did I read that correctly? |
| 11 | A. Yes. |
| 12 | Q. All right. And if you recall, was there |
| 13 | a reason stated in the affidavit as to why the search |
| 14 | needed to be conducted at night? |
| 15 | A. No. |
| 16 | Q. Okay. If we could go down on that page a |
| 17 | little bit, you have your Roman numeral VI and then |
| 18 | big capital B, Number 2. So this is talking about |
| 19 | information necessary to obtain probable cause for |
| 20 | search warrant. And one of the sources it says is |
| 21 | "credible informant information"; is that right? |
| 22 | "Creditable," I should say. Not "credible." |
| 23 | A. Yes. |
| 24 | Q. Okay. And so, I think we're on the same |

Joshua Carver
August 29, 2024

Page 42

1  page here, but here the creditable informants that
2  Mr. Myers was in the courthouse at that time would
3  have been yourself and Mr. Frazier; right?
4     A.   Yes.
5     Q.   And the creditable informant that it was
6  published would have been you, because you personally
7  saw it published on the social media of the Guardian,
8  on Derek Myers's social media page, and on the
9  Guardian's own website; right?
10    A.   Yes.
11    Q.   Okay.  If we could flip the page.  So up
12 top that's that Roman numeral VII, capital A,
13 Number 1.  So capital A said, "A search warrant shall
14 not be issued until there is filed with the judge and
15 an affidavit is attached that particularly describes
16 the following."  Number 1 says, "Background and
17 experience information of the affiant."
18        So that person with regards to the arrest
19 affidavit and the computer affidavit was you; right?
20 You were the affiant?
21    A.   Yes.
22    Q.   Did either of those documents include a
23 narrative of your background and experience
24 information?

Page 43

1     A.   That's on file with the court.  They know
2  what I do.
3     Q.   Is that information included in those
4  documents?
5     A.   No.
6     Q.   Okay.  All right.  If we could go to
7  page -- numbered Page 279.  Under Roman numeral IX,
8  capital letter A.  It says, "The sheriff requires
9  whenever possible that the detective section
10 participates in the preparation and execution of a
11 search warrant.  They should review the probable
12 cause on which the search warrant request is based."
13        Did I read that correctly?
14    A.   Yes.
15    Q.   Okay.  Were you a member of the detective
16 section at this time?
17    A.   Yes.
18    Q.   Okay.  Thought so.  Did anyone else in
19 that section, to the best of your recollection,
20 participate in helping you decide whether to request
21 these warrants?
22    A.   Legal counsel for our office.
23    Q.   Okay.  And who would that be?
24    A.   Currently it's Judge Junk.

Page 44

1     Q.   Who was it at this time?
2     A.   Judge Junk.
3     Q.   Okay.  Any of his -- were any of his --
4  he was then Prosecutor Junk; is that right?
5     A.   That's correct.
6     Q.   Did you consult specifically with
7  Prosecutor Junk on this case at that time?
8     A.   Yes.
9     Q.   Was Mike Davis an assistant prosecutor at
10 that time?
11    A.   Yes.
12    Q.   Did you consult with him as well, if you
13 recall?
14    A.   No.
15    Q.   No.
16    A.   It's also a state prosecutor Angela
17 Canepa.
18    Q.   Okay.  So you consulted with her before
19 you sought the warrants?
20    A.   Yes.
21    Q.   Okay.  And she advised you that it was
22 permissible or advisable to seek those warrants?
23    A.   All legal counsel.
24    Q.   Okay.  And could you spell her last name?

Page 45

1     A.   Sure could not.
2     Q.   Okay.  Does she work for the Ohio
3  Attorney General?
4     A.   She's special counsel on the Wagner
5  cases.  So I don't -- I can't say.
6     Q.   Was she the prosecutor on the Wagner
7  cases?
8     A.   Yes.
9     Q.   So you consulted -- I'm sorry.  Can you
10 tell me her name again?
11    A.   Canepa.  Angela Canepa.
12    Q.   So you consulted with Ms. Canepa and
13 Mr. Junk before you sought the warrants in this case?
14    A.   Yes.
15    Q.   Okay.  And they both advised you that you
16 should seek those warrants?
17    A.   They both advised that it was the -- they
18 believed it was the violation of that statute.
19    Q.   Of A3?
20    A.   Yes.
21    Q.   Okay.  So they advised that it was
22 permissible to seek the warrants?
23    A.   Yes.
24    Q.   Okay.  And I guess this goes hand in hand

Joshua Carver
August 29, 2024

Page 46

1  with Point C on there.  It says "Whenever possible,
2  the search warrant and affidavit should be reviewed
3  by the prosecutor"; is that right?
4      A.   Yes.
5      Q.   And that's what happened here; is that
6  correct?
7      A.   Yes.
8      Q.   And going right above that, capital B, it
9  says "A supervisor will review the search warrant and
10 the affidavit to ensure that probable cause exists to
11 support the warrant and that the paperwork has been
12 properly prepared"; is that right?
13     A.   Yes.
14     Q.   And did a supervisor to the best of your
15 recollection --
16     A.   I am a supervisor.
17     Q.   You were the supervisor.  Okay.
18     A.   But I staffed it with Chief Dixon, my
19 probable cause, along with informing his direct
20 supervisor, the sheriff.
21     Q.   Okay.  So before you got the warrants you
22 got clearance from the chief deputy and from the
23 sheriff; is that right?
24     A.   They were informed of my probable cause.

Page 47

1  I don't have to have clearance if I have probable
2  cause to seek that.
3      Q.   So they were informed of your probable
4  cause.  And they didn't stop you from proceeding; is
5  that right?
6      A.   That is correct.
7           THE WITNESS:  Can we have five?
8           MR. ROBINSON:  Sure.  Let's go off the
9  record for a minute.
10          (Recess taken.)
11 By Mr. Robinson:
12     Q.   All right.  Lieutenant Carver, I have
13 just a couple more questions for you.
14          Did you ever consider issuing a summons
15 to Mr. Myers rather than going the arrest warrant
16 route?
17     A.   We do not do summonses for felony
18 charges.
19     Q.   Okay.  That's just a blanket policy?
20     A.   Yeah.
21     Q.   Okay.  Could you look at numbered
22 Page 378 in that document in front of you, which is
23 No. 17 -- Exhibit 17.  So at the top of 378 on Roman
24 numeral I, capital letter A, it says, "Arrest may

Page 48

1  take place with or without a warrant.  First, the
2  officer should consider whether the issuance of a
3  summons would suffice instead of a warrant."
4           Did I read that correctly?
5      A.   Which letter are you on.
6      Q.   Letter -- I'm sorry.  Page 378, not 278?
7      A.   I'm sorry.  I thought you said 278.
8      Q.   My bad.  If I did, I was wrong.  So we're
9  on Page 378, Roman numeral I, capital A.  Says
10 "Arrests may take place with or without a warrant.
11 First, the officers should consider whether the
12 issuance of a summons would suffice instead of a
13 warrant."
14          Did I read that correctly?
15     A.   Yes.
16     Q.   So your testimony is that despite what
17 the manual says, the department's practice is if a
18 felony's involved you do not consider a summons, you
19 do a warrant?
20     A.   The corrections department if it's a
21 felony, especially with a $20,000 bond.  They do
22 not -- I do not allow summonses to be issued.
23     Q.   Okay.  One more thing that we already
24 talked about.  But I got to thinking I'm not sure the

Page 49

1  way that we said it was totally clear for the
2  transcript.  So I want to ask again.  We deposed
3  Sheriff Evans this morning.  And he said, as you
4  acknowledged, that he spoke with you about the case.
5  I just want to confirm that, in fact, you talked to
6  Sheriff Evans -- I just want to confirm the fact that
7  you talked to Sheriff Evans about the case before any
8  of the warrants were applied for; is that right?
9      A.   Yes.  He was apprised of the situation.
10     Q.   Okay.  Let's see.  One more question, I
11 believe.  So this document I'm not going to introduce
12 as an exhibit.  It's an email from Ryan Pacala to
13 Alan Wheeler talking about Derek Myers's cell phone.
14 Do you see the second line of the body?  Starting at
15 the end of that first line.  It says that "The
16 passcode contains an alphanumeric pass code."
17     A.   Uh-huh.
18     Q.   Do you know what that means?  What does
19 "alphanumeric" mean?
20     A.   Numbered or lettered.
21     Q.   Numbers and letters.  Okay.  All right.
22 That's it.  No further questions.
23          MS. SARK:  You can either read your
24 deposition -- you can't change the testimony.  But if

Joshua Carver
August 29, 2024

Page 50

1  you believe something was taken down incorrectly,
2  then you can note that at the end of it.  Or you can
3  waive.  I'm going to go ahead and recommend that we
4  waive.
5           THE WITNESS:  I'd say waive.
6           MS. SARK:  Okay.  We'll waive.
7           STENOGRAPHER:  Okay.  And then does
8  anyone need this transcript from today?
9           MR. ROBINSON:  Yes.
10          MS. SARK:  I'll need a copy.
11                      - - -
12          Thereupon, at 2:31 p.m., Thursday, August
13  29th, 2024, the deposition was completed.
14                      - - -

Page 51

1                    CERTIFICATE
   STATE OF OHIO          :
2                         :  SS:
   COUNTY OF JACKSON      :
3
4       I, Kathryn R. Thorne, Shorthand Reporter and
5  Notary Public in and for the State of Ohio duly
6  commissioned and qualified, do hereby certify that
7  the transcript of Joshua Carver was taken by me and
8  before me at the time and place for the purpose
9  specified in the caption hereof.
10      I FURTHER CERTIFY that the foregoing
11 transcript of said testimony is a true and correct
12 transcript of the testimony given by the said witness
13 at the time and place specified herein.
14      I FURTHER CERTIFY that I am not a relative or
15 employee or attorney or counsel of any of the
16 parties, or financially interested directly or
17 indirectly in this action.
18      Given under my hand this 9th day of September,
19 2024
20      My Commission expires June 26, 2027
21
22              *Kathryn Thorne*
                Kathryn Thorne
23              Court Reporter
                Notary Public-State of Ohio
24