```
              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
                      EASTERN DIVISION

                   Case No. 2:23-cv-4102

                            - - -
```

DEREK J. MYERS, ET AL.,

                                        plaintiffs,

V.

PIKE COUNTY, ET AL.,

                                        defendants.

DEPOSITION OF JAMES BURCHETT

The deposition of James Burchett was taken on Thursday, August 29th, 2024, at 11:52 a.m., at the Pike County Government Center, 230 Waverly Plaza, Waverly, Ohio.

James Burchett
August 29, 2024

```
                                                          Page 2
 1   ON BEHALF OF THE PLAINTIFFS:
 2         Marc D. Mezibov, Esquire (via Zoom)
           Mezibov Butler
 3         615 Elsinore Place, Suite 105
           Cincinnati, Ohio 45202
 4         mmezibov@mezibov.com
 5         Emmett E. Robinson, Esquire
           Robinson Law Firm LLC
 6         6600 Lorain Avenue, Suite 731
           Cleveland, Ohio 44102
 7         erobinson@robinsonlegal.org
 8
 9
     ON BEHALF OF THE DEFENDANTS:
10
           Cassaundra L. Sark, Esquire
11         Lambert Law Office, LLC
           215 South 4th Street
12         Ironton, Ohio 45638
           csark@lambert-law.org
13
14
15
     ALSO PRESENT:
16
           Derek Myers (via Zoom)
17
18
19
20
21
22
23
24
```

```
                                                          Page 3
 1                       INDEX
 2   EXAMINATION                                       PAGE
 3   Mr. Mezibov                                          4
 4
 5
 6
     EXHIBITS                                          PAGE
 7
     None
 8
 9
10
11
     Stenographer's Certificate                          18
12
13
14
15
16
17
18                        - - -
19
20
21
22
23
24
```

```
                                                          Page 4
 1              JAMES BURCHETT,
 2   being by me first duly sworn, as hereinafter
 3   certified, deposes and says as follows:
 4                  EXAMINATION
 5   By Mr. Mezibov:
 6        Q.   Good morning.  You are James -- is it
 7   Burchett or Burchett?  How do I pronounce it?
 8        A.   It is Burchett.  It's Burchett.
 9        Q.   Burchett?
10        A.   Yeah.  Burchett.
11             MR. ROBINSON:  Burchett.
12        Q.   And how do I address you?  Do I call you
13   deputy chief?  Do I call you chief?
14        A.   You can just address me as Jim if you
15   want to.
16        Q.   No.  No.  You're entitled to better than
17   that.
18        A.   Well, my title is captain.
19        Q.   Captain?
20        A.   Yes, sir.
21        Q.   All right.  Captain.  Captain, my name is
22   Marc Mezibov.  I'm the one asking you the questions.
23   I represent Mr. Myers along with Mr. Robinson who's
24   across the table from you.  But I'll be the one
```

```
                                                          Page 5
 1   asking the questions.  And I'll tell you I don't
 2   think we're going to be here too terribly long.
 3   Because I think we got a lot of stuff done with the
 4   sheriff before you identifying papers and such.  But
 5   I do have questions of you.
 6             So let me ask you this:  Have you ever
 7   been deposed before?
 8        A.   Yes.  I have.
 9        Q.   All right.  My guess is this will sound
10   familiar to you.  And we'll follow probably the same
11   format that was followed in your previous experience.
12   I'm going to be asking you questions.  And I don't
13   want you to guess at what I'm asking you.
14             Okay.  So if my questions are problematic
15   for any reason, you don't understand what I'm asking
16   you, I use a word that's unfamiliar or improperly
17   used or I garble my words or make the thing for
18   complex than it need be, tell me that.  Okay.  I'm
19   not trying to confuse you or trick you.  I do want to
20   get your answers as accurately as I can.  Okay?
21        A.   Okay.
22        Q.   All right.  Let me finish my question
23   before you begin your answer.  I'll want to hear your
24   answer before I begin my next question.  Only reason
```

James Burchett
August 29, 2024

```
                                                                    Page 6
 1   we do that is that we don't make it confusing for Kay
 2   as the court reporter.  She wants to get everything
 3   down as accurately and as completely as possible.  So
 4   if we don't talk over one another, that will go a
 5   long way to accomplish that fact -- accomplish that
 6   goal.  Okay?
 7        A.    I'm ready.
 8        Q.    All right.  Answer, please, all my
 9   questions audibly not simply by a nod of the head so
10   that Kay knows what you're saying.  All right?
11        A.    I'm waiting.
12        Q.    What's that?
13        A.    I said I'm waiting.
14        Q.    You're waiting?
15        A.    Yes, sir.  I'm ready.
16        Q.    All right.  Here's my question.  Are you
17   employed?
18        A.    Yes, sir.  I am.
19        Q.    By whom?
20        A.    Pike County Sheriff's Office.
21        Q.    And how long have you been employed by
22   the Pike County Sheriff's Department?
23        A.    Let's see.  September the 2nd of this
24   year, I'll be going into my 18th year, I do believe.
```

```
                                                                    Page 7
 1        Q.    And how long have you been chief deputy?
 2        A.    I'm not a chief deputy.  I'm a captain.
 3        Q.    Oh, you're captain.  I'm sorry.
 4        A.    Yes, sir.
 5        Q.    How long have you been a captain?
 6        A.    I'm going to say off the top of my head
 7   probably about five, six years.
 8        Q.    Okay.  And to whom do you report as
 9   captain?
10        A.    Well, I report to my sheriff, and I also
11   report to the courts who I serve.
12        Q.    And I say "report."  I mean, who's your
13   immediate supervisor?
14        A.    My immediate supervisor right now is our
15   chief deputy, Christopher Jones.
16        Q.    At some time, did you report to a
17   gentleman named Dixon?
18        A.    Yes, sir, I did.
19        Q.    When was that?
20        A.    That was all the way up until about a
21   year ago.  Until his departure.
22        Q.    Okay.  And in what way would you report
23   to Mr. Dixon?
24        A.    Mr. Dixon always kept track of all the
```

```
                                                                    Page 8
 1   cases that we were currently working.
 2        Q.    And did you ever have direct contact with
 3   the sheriff himself?
 4        A.    Of course.  Yes.
 5        Q.    How and under what circumstances?
 6        A.    Well, we usually would meet couple times
 7   a week to discuss cases that we were working on.  Or
 8   just to discuss general things that were happening
 9   around the office -- administrative things.
10        Q.    We have -- I'm sorry.  I didn't mean to
11   speak over you.
12              We have marked a document earlier as
13   Exhibit 7, which I'm going to ask Emmett to put in
14   front of you.  Have you seen Exhibit 7 previously?
15        A.    Yes.  Yes.  I have.
16        Q.    What is this?
17        A.    Well, this is actually -- it lays out my
18   job description.
19        Q.    Okay.  And it says you supervise all
20   functions of the sheriff's office; is that correct?
21        A.    Not exactly every function.  But pretty
22   much so, yes.
23        Q.    Okay.  What functions are not supervised
24   by you?
```

```
                                                                    Page 9
 1        A.    Well, this has changed since this lawsuit
 2   has been filed.  My role at the sheriff's office is
 3   constantly evolving.  Can you be more specific?
 4        Q.    Sure.  I'm talking about -- do you know
 5   our client, Derek Myers?
 6        A.    Yes.  Charlie Reeder's cousin, I do
 7   believe.  Yes.  I know him.
 8        Q.    How do you know Mr. Myers?
 9        A.    Well, back when Charlie Reeder was
10   sheriff, he wanted me to partner up with Mr. Myers
11   and work closely with him.
12        Q.    Okay.  So you knew Mr. Myers personally?
13        A.    No.  Not really.  I didn't approve of
14   that type of relationship.
15        Q.    Okay.  Did you ever, in your professional
16   capacity, have any experiences with Mr. Myers?
17        A.    Not really.
18        Q.    Did you ever serve any process on him?
19        A.    Yes.  I did during the Rhoden Gilley
20   homicide trial.
21        Q.    All right.  That's what I'm interested
22   in.
23        A.    Okay.
24        Q.    Tell me what process you served on
```

Page 10

1  Mr. Myers?
2      A.   Okay.  Well, I was asked that day,
3  because we were short-handed, if I would work
4  security at the front door of the common pleas
5  courthouse.
6      Q.   Who asked you to do that?
7      A.   To be honest, I don't know if it was the
8  sheriff or if it was the chief deputy.  I don't
9  remember.  It's been a while back.
10     Q.   Go on.  Tell me what happened.
11     A.   I said, "Sure.  No problem."  Because,
12 like I said, my job description is ever evolving.
13 And due to being short-staffed and stuff, we all have
14 to chip in.  So I did.  And I worked security at that
15 day at the front door.
16          And Lieutenant Carver along with the
17 prosecutor's investigator, Alan Wheeler, came to me
18 because the prosecutor along with Lieutenant Carver,
19 who was over court security at that time, gave me
20 instructions, per the prosecutor, that when Mr. Myers
21 was to arrive that I was to seize his cell phone and
22 also give him a copy of an inventory of a search
23 warrant that they had executed.
24     Q.   Okay.  And that direction came to you

Page 11

1  from whom?
2      A.   That came from the prosecutor
3  investigator and from Lieutenant Carver.  They were
4  operating under the direction of the prosecutor,
5  which was Robert Junk.
6      Q.   And do you know what involvement, if any,
7  the sheriff had in that process?
8      A.   No, sir.  I do not.
9      Q.   You do not?
10     A.   No, sir.  I do not.
11     Q.   Did you ever have any direct discussions
12 with the sheriff concerning the duties that you were
13 assigned on that day?
14     A.   No.  There was nothing to discuss.  I was
15 asked to perform those duties and I did.
16     Q.   Okay.  So what exactly did you do?
17     A.   I did exactly what I was asked to do.
18     Q.   Which was?
19     A.   I worked security at the front desk -- at
20 the front door.
21     Q.   Correct.
22     A.   And I also followed the instruction from
23 the prosecutor and his investigator.  And I seized
24 Mr. Myers's cell phone.  I served him with an

Page 12

1  inventory list.  And I also wrote on that inventory
2  list that we had taken his cell phone from him,
3  because I wanted him to have some kind of receipt.
4      Q.   Let me show you what's been previously
5  marked as Exhibit 12.
6          MR. ROBINSON:  All right.  Good to go,
7  Marc.
8          MR. MEZIBOV:  Thank you.
9  By Mr. Mezibov:
10     Q.   All right.  Captain, do you have
11 Exhibit 12 in front of you?
12     A.   Yes.  I do.
13     Q.   Does that say it's an affidavit for
14 search warrant?
15     A.   Yes, sir.  It does.
16     Q.   And on the third page appears to be a
17 signature of the applicant/affiant.  Do you see that?
18     A.   Yes.  I do.
19     Q.   And who's signature is that?
20     A.   I can't, one hundred percent, say for
21 sure.  But it does look like it is an Alan Wheeler.
22     Q.   All right.  And have you seen this
23 document before?
24     A.   No, sir.  Not until today.

Page 13

1      Q.   All right.  Did you see any affidavit for
2  search warrant when you were assigned the duties --
3      A.   At the courthouse door?
4      Q.   Yes.
5      A.   As security?  No, sir.  I did not.
6      Q.   Were you armed with a search warrant when
7  you seized the cell phone of Mr. Myers?
8      A.   No.  I was not.  I don't need a search
9  warrant to seize a cell phone.  I need a search
10 warrant to get into the cell phone.  So when I
11 followed the instruction from the prosecutor and his
12 investigator, I knew I wasn't breaking any laws.
13     Q.   Okay.  Let me ask you to look at
14 Exhibit 13, please.
15          MS. SARK:  It's attached to the back.
16          MR. ROBINSON:  Confusing.
17          MS. SARK:  Or, no, sorry.  That was what
18 I --
19 By Mr. Mezibov:
20     Q.   Do you have Exhibit 13 in front of you?
21     A.   Yes, sir.  I do.
22     Q.   Is that what's called a search warrant?
23     A.   That's what it appears to be, yes, sir.
24     Q.   And is that the search warrant that if

James Burchett
August 29, 2024

Page 14

1 you look on the second page is dated November 2nd,
2 2022?
3     A.   Okay.  The date of what I'm looking at
4 here looks like it is 11/2 of '22.
5     Q.   Correct.  And there's a judge's signature
6 there?
7     A.   There is a signature there.  I wasn't
8 present.
9     Q.   I can't read it either.  Do you know who
10 it is?
11     A.   To be honest with you, no, sir.  I can't
12 tell you whose signature that is.
13     Q.   So tell me about your interaction with
14 Mr. Myers on that day.
15     A.   He came in, was being processed through
16 security.  He set his cell phone down.  I told him
17 that I was instructed to confiscate his cell phone,
18 and I took it and told him I had another paper for
19 him.  I do believe he was a little perturbed.  I'm
20 not going to say upset but perturbed.
21     He turned around and walked outside.  He
22 had another gentleman with him of a heavyset build.
23 And I remember I turned around behind me.  I got the
24 inventory list.  And I remember jotting down --

Page 15

1 putting on that inventory list that -- his cell phone
2 on it.  Because I wanted him to have some type of
3 receipt.  And I --
4     Q.   Did you ever exhibit or show to Mr. Myers
5 any document signed by the judge?
6     A.   No.  Why would I?  I didn't need a search
7 warrant to take and confiscate his phone.
8     Q.   Okay.  Why did you not need a search
9 warrant to confiscate his phone?
10     A.   Because I don't need a search warrant to
11 confiscate somebody's cell phone.  I need a search
12 warrant to get in their cell phone.
13     Q.   All right.  I heard your testimony.  And
14 I'm not quibbling with you.
15     But I just want to understand.  Is it the
16 policy of the sheriff's department to seize an
17 individual's cell phone without benefit of a search
18 warrant issued by a judge?
19     MS. SARK:  Objection.
20     You can answer.
21     A.   Sir, legally we can do it.  And we do do
22 that.  And afterward we obtain a search warrant later
23 for its processing at BCI&I.  Now until the Supreme
24 Court changes that, that is what I follow.

Page 16

1     Q.   All right.  Did you have any other
2 involvement in this Rhoden matter or in the Derek
3 Myers's matter that we're discussing?
4     A.   No, sir.  I hadn't.  No.  I did not.
5     Q.   Why don't we take a moment and --
6     MR. MEZIBOV:  Emmett, can we talk?
7     MR. ROBINSON:  Sure.
8     (Recess taken.)
9     MR. MEZIBOV:  All right.  Well, I told
10 you this would be quick and dirty.  I'm done.  Sorry,
11 Captain.  I know you were looking forward --
12     THE WITNESS:  Actually, sir, there's
13 nothing to apologize for.  I've had one hour of sleep
14 in the past 24 hours, and I'm currently in the middle
15 of a rape case.  This is why I'm dressed the way I am
16 today.
17     MR. MEZIBOV:  Well, I appreciate your
18 time.
19     THE WITNESS:  I got to go do some -- I
20 got to go catch a rapist.
21     MR. MEZIBOV:  I'm done.  Go get the
22 rapist and we're done.
23     THE WITNESS:  So if I felt short with
24 you, I want to apologize.  No disrespect, sir.

Page 17

1     MR. MEZIBOV:  No.  No.  You're fine.
2     Okay.  We'll get a copy of this.
3     MS. SARK:  We'll get a copy as well.
4     STENOGRAPHER:  And will there be
5 signature reserved?
6     MS. SARK:  So you can read the
7 deposition.  You can't change any of the deposition
8 testimony, but if you believe something was taken
9 down incorrectly, you can note it at the end.  Or we
10 can just waive your signature, which means you don't
11 want to read it.  I'm going to recommend we waive if
12 you're fine with that.
13     THE WITNESS:  I'm totally fine with
14 everything that transpired.
15     MS. SARK:  All right.  We'll waive.
16 Thank you.
17     - - -
18     Thereupon, at 12:08 p.m., Thursday,
19 August 29th, 2024, the deposition was completed.
20     - - -

James Burchett
August 29, 2024

Page 18

```
 1                      CERTIFICATE
    STATE OF OHIO         :
 2                        :   SS:
    COUNTY OF JACKSON     :
 3
 4        I, Kathryn R. Thorne, Shorthand Reporter and
 5   Notary Public in and for the State of Ohio duly
 6   commissioned and qualified, do hereby certify that
 7   the transcript of James Burchett was taken by me and
 8   before me at the time and place for the purpose
 9   specified in the caption hereof.
10        I FURTHER CERTIFY that the foregoing
11   transcript of said testimony is a true and correct
12   transcript of the testimony given by the said witness
13   at the time and place specified herein.
14        I FURTHER CERTIFY that I am not a relative or
15   employee or attorney or counsel of any of the
16   parties, or financially interested directly or
17   indirectly in this action.
18        Given under my hand this 9th day of September,
19   2024
20        My Commission expires June 26, 2027
21
22                    *Kathryn Thorne*
                          Kathryn Thorne
23                        Court Reporter
                          Notary Public-State of Ohio
24
```