UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

_____
                                )
DEREK J. MYERS, et al.,         )
                                )
        Plaintiffs,             )
                                )  Case No.
                vs.             )  2:23-cv-4102
                                )
PIKE COUNTY, et al.,            )
                                )
        Defendants.             )
_____)


        Deposition of:  DEREK J. MYERS

        Pursuant to:    Notice

        Date and Time:  Wednesday, September 18, 2024
                        12:11 p.m.
        Place:          Mezibov Butler
                        615 Elsinore Place
                        Suite 105
                        Cincinnati, Ohio  45202
        Reporter:       Tracy L. Allen, RPR, RMR
                        Notary Public - State of Ohio

Page 2

```
 1    APPEARANCES OF COUNSEL:
 2
 3       For the plaintiffs:
 4          Emmett E. Robinson, Esq.
                of
 5          Robinson Law Firm LLC
            6600 Lorain Avenue
 6          #731
            Cleveland, Ohio  44102
 7          216.505.6900
            erobinson@robinsonlegal.org
 8
 9               and
10          Marc D. Mezibov, Esq.
                of
11          Mezibov Butler
            615 Elsinore Place
            Suite 105
12          Cincinnati, Ohio  45202
            513.621.8800
13          mmezibov@mezibov.com
14
15       For the defendant Pike County:
16          Cassaundra Sark, Esq.
                of
17          Lambert Law Office, LLC
            215 South Fourth Street
18          PO Box 725
            Ironton, Ohio  45638
19          740.532.4333
            csark@lambert-law.org
20
21
22                - - -
23
24
25
```

Page 3

```
 1                  I N D E X
 2
 3    DEREK J. MYERS                      PAGE
 4       EXAMINATION BY MS. SARK            4
 5
 6    EXHIBITS               MARKED   REFERENCED
 7       DEPOSITION EXHIBIT 20     15      15
         DEPOSITION EXHIBIT 21     22      22
 8       DEPOSITION EXHIBIT 22     35      36
         DEPOSITION EXHIBIT 23     37      37
 9       DEPOSITION EXHIBIT 24     45      45
         DEPOSITION EXHIBIT 25     52      52
10       DEPOSITION EXHIBIT 26     54      53
         DEPOSITION EXHIBIT 27     55      55
11       DEPOSITION EXHIBIT 28
            (Video)                 -      60
12       DEPOSITION EXHIBIT 29     66      66
         DEPOSITION EXHIBIT 30
13          (Video)                 -      82
         DEPOSITION EXHIBIT 31
14          (Video)                 -     103
15
16                - - -
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                  DEREK J. MYERS
 2    a plaintiff herein, having been duly sworn, was
 3    examined and deposed as follows:
 4                  EXAMINATION
 5    BY MS. SARK:
 6       Q.    Can you state your name for the
 7    record, please?
 8       A.    I'm Derek Joel Myers.
 9       Q.    Okay.  And are you under the
10    influence of any alcohol, drugs, or medication
11    that may impair your ability to truthfully
12    testify today?
13       A.    No.
14       Q.    Okay.  Have you ever had your
15    deposition taken before?
16       A.    I have.
17       Q.    Okay.  So there's some ground rules
18    that every deposition has.
19            The first being, we want to audibly
20    answer.  If you shake your head, it's hard for
21    the court reporter to get a clear record of
22    what's going on.
23            The second thing is, obviously I
24    want to finish my question before you answer.
25    You may think that you know the answer, and
```

Page 5

```
 1    that is fine, but in order to make it easier on
 2    the court reporter, let me finish my question
 3    before you answer.
 4            If you answer my question, I'm going
 5    to assume that you understood it.  If you don't
 6    understand it, ask me to rephrase it.  But if
 7    you do answer, I will assume that you knew
 8    that.
 9            Lastly, if you need a break, that's
10    completely fine.  The only thing I ask is that
11    you answer my question that's pending before we
12    take the break.
13            Do you understand those things?
14       A.    I understand.
15       Q.    Okay.  Perfect.
16            What is your date of birth, Derek?
17       A.    5/8/1992.
18       Q.    And where do you currently reside?
19       A.    152 East Main Street, Chillicothe,
20    Ohio 45601.
21       Q.    Okay.  Are you currently married?
22       A.    I am not married.
23       Q.    Have you ever been married?
24       A.    I have not.
25       Q.    Okay.  Do you have any children?
```

Page 6

1    A.   I do not.
2        Q.   Okay.  Let's go through some
3    educational background.
4             Where did you go to high school?
5    A.   Multiple places.
6        Q.   Okay.
7    A.   Miami Trace High School.
8        Q.   Okay.  And where is that located?
9    A.   Washington Court House, Ohio.
10       Q.   Okay.
11   A.   I transferred to Washington Senior
12   High School, and that's where I received my
13   diploma in 2011.
14       Q.   Okay.  And do you have any education
15   beyond high school?
16   A.   Yes.  I have a series of credits
17   from multiple universities, but ultimately
18   obtained a bachelor's in criminal justice from
19   Walden University.
20       Q.   And where is Walden University at?
21   A.   I believe they're headquartered in
22   Maryland.  It is an online institution.
23       Q.   And what year did you receive your
24   bachelor's in criminal justice?
25   A.   Would have been earlier this year,

Page 7

1    so 2024.
2        Q.   Okay.  Now, after -- let's back up.
3             After high school in 2011, where did
4    you work?  What was your first job after high
5    school?
6    A.   I was an internet marketing manager
7    for the local Ford dealership in Washington
8    Court House.
9        Q.   Okay.  And what were the dates that
10   you worked there?
11   A.   November 2011 for about
12   eight months.
13       Q.   Okay.  And then what was your first
14   news job, news-related job, I should say?
15   A.   Sure.
16        I had started an independent
17   organization called the Washington Blaze in
18   2012.  And operated that for about 18 months in
19   Washington Court House as a local news source.
20       Q.   Okay.  Was that a print news --
21   scratch that.
22        Was it a news source that was
23   printed?
24   A.   Can you define printed?
25       Q.   Was it printed hard copy, available

Page 8

1    such as a newspaper, online only?
2    A.   It was not hard copy.
3        Q.   Okay.  So it was a news source that
4    was available online?
5    A.   Correct.
6        Q.   Okay.  And did you report on local
7    events, national events?
8    A.   All -- both.
9        Q.   Okay.  Now, after -- well, let me
10   ask this.
11        Do you still operate that
12   independent organization?
13   A.   Not that independent organization.
14       Q.   Okay.  So when did Washington
15   Blaze -- did it close?
16   A.   It did.  It was never -- it -- let's
17   see.  2012 is when it operated.  About
18   18 months later.
19       Q.   Okay.  Did you have any other
20   employees?
21   A.   I did not.
22       Q.   So after Washington Blaze stopped
23   operating, what did you -- what did you do
24   after that?
25   A.   I had some various odd jobs.

Page 9

1        Q.   Okay.  Such as?
2    A.   I was a part-time security guard.
3        Q.   Okay.  And after that?
4    A.   I believe I may have tried dabbling
5    in public relations --
6        Q.   Okay.
7    A.   -- as well as property management.
8        Q.   Now, when you worked in public
9    relations, where did you work during that time
10   period?
11   A.   Buffalo, New York.
12       Q.   Okay.  What were you doing?
13   A.   I was a PR specialist.
14       Q.   For who?
15   A.   Farrow PR.
16       Q.   And what is that?
17   A.   It's a public relations agency.
18       Q.   Okay.  So -- so what were your job
19   duties during that time?
20   A.   To handle public relations for
21   existing clients and to procure new clients.
22       Q.   And what type of clientele
23   did you have?  Was it various organizations or
24   individuals?
25   A.   It was a broad spectrum.

Page 10

1    Q.   Okay.
2    A.   For the most part, it was
3 individuals.
4    Q.   Okay.  Now, were these individuals
5 in the political realm?
6    A.   I'm unsure of what their backgrounds
7 were.
8    Q.   Okay.  So after public relations,
9 what did -- in Buffalo, New York, what did you
10 do?
11   A.   I wanted to become a television news
12 reporter.
13   Q.   Okay.
14   A.   So I took a job as a television news
15 reporter in Florida.
16   Q.   Okay.  What news station did you
17 work for?
18   A.   The call letters are WCJB.
19   Q.   Does that stand for anything?
20   A.   Not to my knowledge.
21   Q.   Okay.  And you said that was in
22 Florida?
23   A.   Yes.
24   Q.   Okay.  And how long did you work as
25 a -- was it a news anchor position?

Page 11

1    A.   No.
2    Q.   Okay.  What was the position?
3    A.   I was the chief bureau reporter, or
4 what's also known as a multimedia journalist,
5 for Marion County, Florida.
6    Q.   Okay.  And after you finished that
7 job, what was your next job?
8    A.   I was the chief investigative
9 reporter at WVLA-TV in Baton Rouge, Louisiana.
10   Q.   Okay.  And how long were you there?
11   A.   Three weeks.
12   Q.   And what were your job duties while
13 you were there?
14   A.   I was in charge of uncovering
15 political news and as well as investigative
16 news stories.
17   Q.   Okay.  And after that position?
18        Let me back up.  What time frame
19 were you in Georgia?
20   A.   I wasn't in Georgia.
21   Q.   Oh, I'm sorry.  Chief investigator.
22 Where were you when you were the chief
23 investigator?
24        MR. MEZIBOV:  Louisiana.
25 BY MS. SARK:

Page 12

1    Q.   Louisiana.  I apologize.
2    A.   Yes, it was in Louisiana.
3        I'm sorry.  Can you reask the
4 question?
5    Q.   Yes.
6        What year or time frame were you in
7 Louisiana?
8    A.   2015.
9    Q.   Okay.  So let's kind of speed this
10 up a little bit.
11       When did you become -- when did you
12 start working at Scioto Valley Guardian?
13   A.   Scioto Valley Guardian was launched
14 in 2019.
15   Q.   And who launched that?
16   A.   I did.
17   Q.   So at the time that it launched,
18 were you the only individual behind Scioto
19 Valley Guardian?
20   A.   I was.
21   Q.   Okay.  Did it grow after you started
22 it?  Meaning, did you have employees that
23 started working for you?
24   A.   Yes.
25   Q.   Okay.  How many employees did you

Page 13

1 have at the -- at its peak?
2    A.   I want to estimate seven --
3    Q.   Okay.
4    A.   -- including myself.
5    Q.   And you -- scratch that.
6        Since Scioto Valley Guardian began
7 operating, have you always been the editor in
8 chief?
9    A.   Until recently, yes.
10   Q.   And what caused that position
11 change?
12   A.   I took a dive into politics.
13   Q.   Okay.  So when did you step away
14 from Scioto Valley Guardian?
15   A.   I believe it was October of 2023.
16   Q.   Okay.  And, at that time, were there
17 still other employees with the Scioto Valley
18 Guardian?
19   A.   We had transitioned to 1099
20 contractors.
21   Q.   Okay.  Is the Scioto Valley Guardian
22 still in operation as of today?
23   A.   Yes.
24   Q.   Okay.  So it's my understanding that
25 you were present at the trial of George

Page 14

1 Wagner, IV; is that correct?
2     A.  Yes.
3     Q.  Were you present on behalf of the
4 Scioto Valley Guardian?
5     A.  Yes.
6     Q.  Okay.  So I'm going to hand you what
7 I've labeled as Exhibit A.
8     MS. SARK:  And since we jumped
9     around on exhibits, number-wise, I
10     just -- oh, sorry.  I don't -- I almost
11     handed you my work copy.  I just went
12     ahead and used letters since --
13     MR. ROBINSON:  Sounds like a good
14     idea.
15     MR. MEZIBOV:  You put letters on
16     them?
17     MS. SARK:  Yes.
18     MR. MEZIBOV:  Can I make a
19     suggestion?
20     I think life is easier if we just
21     use the numbers, but you don't have to
22     call them defense exhibits, just numbers
23     as we use them.
24     I mean, if they're already marked --
25     MS. SARK:  Okay.

Page 15

1     MR. MEZIBOV:  Showing what's been
2 previously marked Exhibit 1.  It's less
3 confusion, honestly, for everybody.
4     MS. SARK:  Can we go off the record
5 just for a second?
6     (Off the record.)
7     MS. SARK:  We can go back on the
8 record.
9     (Deposition Exhibit 20 was marked for
10     identification.)
11 BY MS. SARK:
12     Q.  So I've handed you what's labeled as
13 Order Regarding Media Participation And General
14 Decorum At All Proceedings, Including But Not
15 Limited To Pretrials, Motion Hearings, Voir
16 Dire, And/Or Trial; is that correct?
17     A.  Yes.
18     Q.  Okay.  And can you tell me what case
19 this was filed in?
20     A.  The case number is 2018-CR-000155,
21 State of Ohio versus George Washington Wagner.
22     Q.  And it was filed on July 1st, 2022;
23 is that accurate?
24     A.  According to the time stamp here.
25     Q.  Okay.  Have you seen this order

Page 16

1 prior to today?
2     A.  I have.
3     Q.  Were you present the day the trial
4 began?
5     A.  I was.
6     Q.  Do you recall what month that began?
7     A.  I do not.
8     Q.  Did you receive an order -- or
9 excuse me.
10     Did you receive a copy of this order
11 prior to the trial beginning?
12     A.  I did not.
13     Q.  Okay.  Did you receive a copy of
14 this at all?
15     A.  Could you define receive?
16     Q.  Was -- did you see this order prior
17 to Jake Wagner's testimony?
18     A.  Yes.
19     Q.  Do you recall when you saw this
20 order?
21     A.  Yes.  It was the first day of trial.
22     Q.  Okay.  So the first day of trial you
23 saw this order, correct?
24     A.  Allow me to rephrase.
25     It was the first day of proceedings

Page 17

1 for the trial.
2     Q.  Okay.
3     A.  Might have been voir dire.
4     Q.  Okay.  Did you read this in its
5 entirety?
6     A.  I did.
7     Q.  Did you understand it?
8     A.  Yes.
9     Q.  I'm going to have you turn to
10 page 3, and it would be paragraph 4.
11     Do you care to read that first
12 sentence for me out loud?
13     A.  Beginning on July 5th, 2022, all
14 electronic devices, including but not limited
15 to computers, cameras, cell phones, video
16 phones, personal digital assistants, tape
17 recorders or other recording or transmitting
18 devices shall be barred from the courtroom
19 and/or any other facility and/or locations
20 where proceedings in this matter are held,
21 except as provided in this Order.
22     Q.  Okay.  Now, I think it actually
23 says, shall be barred from the Courthouse,
24 correct?  Is that correct?
25     A.  I believe I read it as it stated.

Page 18

1  It does say, device shall be barred from the
2  Courthouse.
3      Q.   Okay.  So you were aware, before the
4  trial began, that electronic devices were not
5  permitted in the courtroom; is that correct?
6      A.   Not before the trial began.
7      Q.   Okay.  There might be some
8  confusion.
9           I thought you said that you received
10  this order on the first day proceedings began
11  for the trial.
12      A.   Before the gavel hit to bring in --
13  or before the judge read into the record the
14  case caption --
15      Q.   Uh-huh.
16      A.   -- there was an order of this
17  presented to me on the day of the proceedings
18  where trial was commencing.  It might have been
19  voir dire.
20           When I say trial, I'm talking about
21  the -- from voir dire to --
22      Q.   Right.
23      A.   -- verdict.
24      Q.   Right.  Right.  We're not talking
25  about when witnesses started testifying.  We're

Page 19

1  talking about from the inception of State of
2  Ohio versus George Wagner, IV?
3      A.   Well, it wouldn't be the inception,
4  because that would have been several years
5  prior.  But the actual trial itself, yes.
6           I just can't recall if it was the
7  first day of voir dire or the first day of
8  opening statements.
9      Q.   Okay.  So then you were aware, when
10  the trial began, that all electronic devices
11  were barred from the courthouse and any other
12  facility or location where the proceedings were
13  held, correct?
14      A.   I understood that is what the order
15  read.
16      Q.   Did -- let me back up.
17           Can you read the next two sentences
18  for me in paragraph 4, starting at Media
19  personnel, right where you left off?
20      A.   Media personnel may petition the
21  Court for permission to bring in still cameras,
22  television cameras and/or audio recording
23  devices for use in the Courtroom, as provided
24  in this Order.
25           Only those cameras or recording

Page 20

1  devices that are specifically authorized by the
2  Court shall be permitted in the Courthouse
3  and/or Courtroom and/or any other facility
4  and/or locations in which proceedings in this
5  matter are held.
6      Q.   So did you personally ever petition
7  the Court for permission to bring in a still
8  camera, television camera, audio recording
9  device, or any other electronic device?
10      A.   I don't recall.
11      Q.   Would that be something that the
12  Court would have in its possession, if you
13  petitioned the Court?
14      A.   If they maintain their public
15  records correctly, I would imagine.
16      Q.   So how would you petition the Court?
17  Did it have to be in writing or could you
18  verbally petition the Court?
19      A.   I don't know the rules of procedure
20  for the Court.  My standard procedure would
21  have been in writing.
22      Q.   Would you have a copy of that, as
23  well, if you petitioned the Court?
24      A.   If I petitioned the Court, I would
25  still have a copy.

Page 21

1      Q.   Okay.  But you don't recall if you
2  petitioned the Court?
3      A.   I cannot recall.
4      Q.   Do you recall if, on behalf of a
5  media organization, you petitioned the Court
6  for permission to bring in a still camera,
7  television camera, audio recording device, or
8  any other electronic device?
9      A.   No, I can't recall.
10      Q.   Did you ever petition the Court to
11  use your cell phone as a recording device?
12      A.   Not that I recall.
13      Q.   So you were not permitted to have
14  your cell phone in the courtroom; is that
15  accurate?
16      A.   I believe the order stated that the
17  phones were not to be present in the courtroom.
18  That is correct.
19      Q.   So you were not permitted to have
20  your cell phone, correct?
21      A.   Correct.
22      Q.   Did you ever bring your cell phone
23  into the courtroom while the trial was being
24  conducted?
25      A.   I did.

Page 22

1    Q.    How many times, if you had to guess?
2    A.    I know there was at least once.
3    Q.    Okay.  Why does that one time stick
4 out in your mind?
5    A.    That was the day that I had assumed
6 the role of producer.  And it sticks out in my
7 mind because it was questioned as to why I had
8 my cell phone in the courtroom, by the family.
9         And I explained to the bailiff that
10 I was acting in the capacity as the producer
11 for what's known as the media pool.
12    Q.    I'm going to hand you what we'll
13 mark as Exhibit 21.
14         (Deposition Exhibit 21 was marked for
15          identification.)
16 BY MS. SARK:
17    Q.    I'm going to let you review this.
18         Have you ever seen this document
19 prior to today?
20    A.    I have.
21    Q.    Do you know who Jason Frazier is?
22    A.    I do.
23    Q.    Who is he?
24    A.    At the time of the proceedings in
25 the Wagner trial, he was the bailiff for the

Page 23

1 Court.
2    Q.    Okay.  And at the top, it says, On
3 October 3rd, 2022, at about 12:00 p.m., I was
4 contacted by members of the news media that
5 Derek Myers, editor of the Scioto Valley
6 Guardian, was attempting to assert control of
7 the camera pool and label himself as a
8 producer.
9         So on October 3rd, were you the
10 producer for the news media organizations?
11    A.    I had taken that position, yes.
12    Q.    When you say taken that position,
13 what do you mean?
14    A.    Court TV had withdrawn from the
15 trial --
16    Q.    Uh-huh.
17    A.    -- and the position was left vacant,
18 and I assumed the role.
19    Q.    In order to become the producer, was
20 there a process that had to occur?
21    A.    Not to my knowledge.
22    Q.    So no one else had to agree on who
23 the producer was, correct?
24    A.    Not to my knowledge.
25    Q.    Okay.  The next sentence says, I was

Page 24

1 informed that no one has agreed to Mr. Myers'
2 desire to supervise the camera pool.  At about
3 12:45 p.m., I received an email from Derek
4 Myers with an attached -- attachment letter
5 stating that members of the news media had
6 agreed to Derek being the camera pool producer.
7         So did you send an email with an
8 attachment letter to Jason Frazier stating that
9 members of the news media agreed to you being
10 the camera pool producer?
11    A.    It was addressed to Judge Deering.
12 Mr. Frazier was our liaison.
13    Q.    Uh-huh.
14    A.    When I say we, I mean the news
15 media.  He was our liaison.  So it was
16 addressed to Judge Deering.  Emailed to
17 Mr. Frazier to pass to Judge Deering.
18    Q.    Okay.  So in that email, did you
19 state that members of the news media had agreed
20 to you being the camera pool producer?
21    A.    I don't recall what the email
22 stated.
23         MS. SARK:  Okay.  Can we go off the
24         record for one second?
25         (Off the record.)

Page 25

1 BY MS. SARK:
2    Q.    So before we went off the record, I
3 think you said you did not recall what the
4 email that you sent to Judge Deering stated; is
5 that correct?
6    A.    That's correct.
7    Q.    Okay.  If you look at the second
8 page of Exhibit 21, do you have that packet?
9    A.    I do not.  I was not provided a
10 copy.
11    Q.    So if you look at that second page,
12 have you seen this document before?
13    A.    Yes.
14    Q.    Okay.  What is this document?
15    A.    This is a letter dated for
16 October 3rd, 2022, by me to Judge Deering.
17    Q.    And what is -- what is this email
18 concerning?
19    A.    This was a letter on Scioto Valley
20 Guardian letterhead, attached as a PDF to the
21 email, informing the court and Judge Deering
22 that myself, on behalf of the Guardian, would
23 be the television news pool producer in the
24 courtroom.
25    Q.    Okay.  In the second paragraph,

Page 26

1 under Judge Deering, it says, Effective
2 immediately, Derek Myers of Scioto Valley
3 Guardian is the television pool producer in the
4 courtroom. He should be the Court's point of
5 contact for all television related activities
6 in the courtroom until further notice.
7 Is that accurate, what that says?
8 A. Yes.
9 Q. Okay. How did you become the
10 television pool producer?
11 A. As previously stated, Court TV had
12 pulled out. They had, previously, a designated
13 reporter to be producer in the courtroom, who
14 acted as the one who would take full notes.
15 They had their cell phone. They
16 were the ones who were in contact with
17 Mr. Frazier about who was opting in and opting
18 out of the trial proceeding so that could be
19 relayed downstairs to the media room.
20 It also was to allow us, in the
21 media room, to know when breaks were occurring.
22 And they were also taking general notes.
23 When that position became vacated,
24 there was no one sitting in that chair to relay
25 that information back downstairs to the media

Page 27

1 room. So that means if the cameras were turned
2 off due to an opt-out, there was no way for
3 anyone in the media room to know what was going
4 on because the pool producer was absent.
5 Q. So as the television pool producer,
6 were you permitted to have your cell phone in
7 the courtroom?
8 A. Historically, in that trial, the
9 television pool reporter -- producer, rather,
10 had always had their cell phone in the
11 courtroom. Again, as I mentioned, to be in
12 communication with Mr. Frazier and to relay
13 information downstairs.
14 Q. Do you have -- scratch that.
15 On October 3rd, 2022, was that the
16 first time that you were the pool producer?
17 A. There was a second time, but I
18 believe that was the first time, yes.
19 I know I had a brief fill-in while
20 Court TV, I think, may have gone to lunch or
21 something, and they had asked me to sit in.
22 Q. Okay. So do you know if Court TV
23 petitioned the Court to have their cell phones
24 in the courtroom?
25 A. I'm not aware of any filings on

Page 28

1 behalf of Court TV.
2 Q. When you became pool producer, did
3 you petition the Court to have your cell phone
4 in the courtroom?
5 A. This letter was my way of informing
6 the Court that I would be the television pool
7 producer.
8 And, as I mentioned, historically
9 speaking, the television pool producer had
10 always been permitted to have their phone in
11 the courtroom.
12 Q. So no, you did not petition the
13 Court, correct, to have your court -- to have
14 your cell phone?
15 A. Not to be difficult, but what is
16 your definition of petition?
17 Q. Did you ask permission to have your
18 cell phone?
19 A. On October 3rd, 2022?
20 Q. Yes.
21 A. I did not ask for permission,
22 because it was assumed and precedent had been
23 set that the television pool producer would
24 have their phone in the courtroom.
25 Q. Did you ever petition the Court for

Page 29

1 permission to have your cell phone in the
2 courtroom?
3 A. Not that I recall.
4 Q. So if you go back to Jason Frazier's
5 Incident Report, the first page of that packet,
6 about halfway down, it says, At about
7 1:41 p.m., Deputy Terry Rose contacted me by
8 text to inform me that he observed Mr. Myers
9 with a cell phone in violation of the Court's
10 order.
11 Do you recall that?
12 A. Well, I was not aware of a text
13 message being sent until I read this incident
14 report during the discovery phases of this 1983
15 action.
16 Q. And then it says, Deputy Rose
17 ordered Mr. Myers to leave the courtroom; is
18 that accurate?
19 A. I don't recall who asked me to step
20 out, but that would have most likely been in
21 line with procedure, as Mr. Rose was tasked
22 with that duty.
23 Q. And then the next sentence says, I
24 spoke with Mr. Myers outside the courtroom. He
25 demanded to know why he was removed for having

Page 30

1  a cell phone that were allowed by others.
2          Who else was permitted to have a
3  cell phone?
4      A.   In the courtroom?
5      Q.   Yes.
6      A.   Multiple people.  The attorneys for
7  both sides, the judge, as well as any law
8  enforcement member, bailiff, the SRT team that
9  was transporting the victims' advocate for the
10 family.
11         But -- I understand your question,
12 and to answer it in what you're looking for
13 is -- what I mean by others is the other folks
14 who had held the chair of television news
15 producer.
16     Q.   Okay.  And then Jason Frazier's
17 incident report states, Mr. Myers and I argued
18 over his assertion that he was the TV producer
19 for the camera pool.  I advised Mr. Myers that
20 I had already spoken with other pool members
21 who denied his claim.
22         Do you remember this conversation
23 with Mr. Frazier?
24     A.   I could not repeat verbatim what was
25 said, but I do remember the encounter.

Page 31

1      Q.   Do you recall him informing you that
2  other pool members denied that you were the
3  pool producer?
4      A.   Again, I don't recall the language
5  of the conversation, but I do remember the
6  encounter.
7      Q.   Okay.  If you'll look at the third
8  page in that packet, have you ever seen this
9  document before?
10     A.   I have.
11     Q.   Can you explain what it is, please?
12     A.   This is an email from my attorney at
13 the time, Jack Greiner, to Jason Frazier.
14     Q.   Okay.  And the email says, Good
15 afternoon, Jason.
16         Is that Jason Frazier, the bailiff?
17     A.   Yes.
18     Q.   For the Hocking County Common Pleas
19 Court, correct?
20     A.   It's Pike County.
21     Q.   Or Pike County.  I apologize.  Pike
22 County.
23     A.   That's okay.
24     Q.   Then it says, Please consider the
25 letter from Derek Myers withdrawn.

Page 32

1          Is he -- when he refers to letters,
2  he's speaking to the previous email that we
3  have looked at that you sent to -- that was
4  stated to be to Judge Deering?
5      A.   That is correct.
6      Q.   This email from Mr. Greiner
7  continues, There was a misunderstanding in the
8  pool.  Mr. Myers believed he was acting as the
9  pool producer, and for that reason, he had his
10 cell phone with him.  He meant no disrespect
11 for the Court.
12         Do you know what misunderstanding
13 Mr. Greiner is referring to?
14     A.   I do.
15     Q.   Okay.  Can you explain what that
16 misunderstanding was?
17     A.   Yeah.  There are no written
18 procedures for how a news pool is to operate.
19 It's really sort of a jungle, so to speak.
20         There are a lot of old school,
21 unwritten rules in news media that it is a --
22 the news pool is a group of news organizations
23 who is to act as a team.  And any decisions
24 that are to affect the pool as a whole, usually
25 there is some sort of vote taken that would

Page 33

1  allow the majority to rule, in favor or
2  against, some sort of request or action that
3  would affect the pool as a whole group.
4          And so what Mr. Greiner's referring
5  to here is, when he says, There was a
6  misunderstanding in the pool, to the best of my
7  recollection, there was some conversation in
8  the pool room downstairs, that because the
9  chair was vacant and there was lack of
10 communication, I stood up in the pool room and
11 said that I would be going upstairs to assume
12 the role.
13         And the misunderstanding comes
14 from -- I believe there was another reporter in
15 the room who was displeased with my taking
16 control of the situation --
17     Q.   Okay.
18     A.   -- to fill the vacancy.  So he
19 complained to Mr. Frazier.
20     Q.   So I think you said earlier, and if
21 I'm incorrect, please let me know.  Court TV
22 was the pool producer?
23     A.   Correct.
24     Q.   When they became the pool producer,
25 was that voted upon by individuals or

Page 34

1  organizations of the media?
2      A.  I'm not sure.  I was not privy to a
3  lot of the things about the pool until the
4  first day of trial.
5      Q.  The first day of trial, were they
6  already the pool producer?
7      A.  Correct.
8      Q.  Was there any other organization or
9  individual that was the pool producer --
10     A.  Throughout --
11     Q.  -- besides yourself or Court TV?
12     A.  Throughout the duration of the
13  trial?
14     Q.  Uh-huh.
15     A.  I'm unsure.  I can't recall.
16     Q.  Do you recall any other time that
17  the news organizations or individuals voted on
18  a pool producer?
19     A.  I do not recall voting on that.
20     Q.  Okay.  Okay.  Let's go back to the
21  media order, Exhibit 20.
22         If you'll turn to page 5 for me, it
23  will be paragraph 10.  And can you read the
24  first three sentences of -- yes, the first
25  three sentences of paragraph 10?

Page 35

1      A.  Paragraph 10 is titled, Prohibited
2  Filming, Videotaping and/or Recording.
3         It goes on to say, paragraph 10,
4  Each witness has the right to object to being
5  filmed, videotaped, recorded or photographed.
6  Any witness who so requests shall not be
7  recorded (either audio or video), televised or
8  photographed.  During the testimony of the
9  objecting witness, all media personnel are
10  prohibited from employing any means to record
11  the witness in or out of the Courtroom.
12     Q.  So you read this paragraph prior to
13  Jacob Wagner's testimony, correct?
14     A.  That is correct.
15     Q.  And are you fine if I refer to him
16  as Jake Wagner, as well?
17     A.  That's fine.  Yeah.
18     Q.  Okay.  Were you aware that Jake
19  Wagner had opted out of being filmed, recorded,
20  photographed, and videotaped during his
21  testimony?
22     A.  I was.
23         (Deposition Exhibit 22 was marked for
24         identification.)
25  BY MS. SARK:

Page 36

1      Q.  I'm going to hand you what has been
2  labeled as Exhibit 22, I think.
3         Have you seen this before?
4      A.  Assuming that it hasn't been
5  altered, I believe so.
6      Q.  Can you explain to me what it is?
7      A.  This is a judicial Notice to
8  Prospective Witnesses of Right to Object to
9  Being Filmed, Videotaped, Recorded or
10  Photographed, under Rule 12, under the
11  Superintendence.
12         It's a form that was created by the
13  Pike County Court of Common Pleas for witnesses
14  to acknowledge their right to being filmed.
15     Q.  And right above Judge Deering's
16  signature line, it says, You are hereby
17  informed pursuant to Rule 12(C) of the Ohio
18  Rules of Superintendence that, as a witness in
19  the above-referenced case, you have the right
20  to object to being filmed, videotaped, recorded
21  or photographed.
22         Is that accurate?
23     A.  That's what it states.
24     Q.  Okay.  And what case was this in
25  that it's referencing above?

Page 37

1      A.  Yeah.  The case that we've been
2  talking about, State of Ohio V. George
3  Washington Wagner.
4      Q.  And are you familiar with Ohio Rules
5  of Superintendence 12(C)?
6      A.  I am.
7      Q.  Have you read Ohio Rule of
8  Superintendence 12(C)?
9      A.  I have.
10     Q.  Okay.  I'm going to give you what
11  is -- what are we on, 20 --
12         MR. MEZIBOV:  23.
13  BY MS. SARK:
14     Q.  23.
15         (Deposition Exhibit 23 was marked for
16         identification.)
17         MR. MEZIBOV:  Is this Rule 12(C)?
18         MS. SARK:  Huh?
19         MR. MEZIBOV:  Is this Rule 12(C)?
20         MS. SARK:  It is.
21     A.  Are we still on the record?
22  BY MS. SARK:
23     Q.  Yes, but we can go off if you need
24  to.
25         Do you need to go off the record?

Page 38

1    A.    No, it's fine.
2    Q.    Oh, okay.
3          Now, at trial, witnesses were
4    permitted to opt out of being filmed,
5    videotaped, recorded, photographed, under Ohio
6    Rule Superintendence 12(C); is that correct?
7    A.    I apologize.  Could you rephrase
8    your -- or could you restate your question?
9    Q.    Absolutely.
10         At the trial of George Wagner, IV,
11   witnesses were able to opt out of being filmed,
12   videotaped, recorded, and photographed under
13   Ohio Rule of Superintendence 12(C); is that
14   accurate?
15   A.    Judge Deering had created the form,
16   which you had previously just spoken about,
17   which was Exhibit 22 --
18   Q.    Uh-huh.
19   A.    -- and it was interpreted by
20   Judge Deering that Rule 12 allowed for a
21   witness to do that.  And by to do that, I mean
22   opt in or out of a -- the ability to be
23   recorded, videotaped, or photographed.
24   Q.    When you say that's how
25   Judge Deering interpreted Rule 12(C), what do

Page 39

1    you mean?
2    A.    It is not how I and other members of
3    the media interpreted 12.
4    Q.    Okay.  Can you turn to the second
5    page for me, of Rule 12(C), and read section
6    (C)(2) under Limitations?
7    A.    C is titled Limitations.  Two says,
8    The judge shall inform victims and witnesses of
9    their right to object to being filmed,
10   videotaped, recorded, or photographed.
11   Q.    And then under the Commentary, under
12   Rule 12(A) Presiding Judge, that second
13   paragraph.  It's just a sentence, but can you
14   read that for me as well?
15   A.    12(A) Presiding Judge.  The judge
16   assigned to the trial or hearing shall --
17   Q.    I'm sorry.  The second paragraph
18   down.  Just the one sentence.
19   A.    Okay.  The filming, videotaping,
20   recording, or taking of photographs of victims
21   or witnesses who object shall not be permitted.
22   Q.    So under Rule 12(C), if a witness
23   objects to being filmed, videotaped, recorded,
24   or photographed, it is not permitted, correct?
25   A.    That is not what 12(C) says.

Page 40

1    Q.    Okay.  Is that what the notes say,
2    the commentary notes?
3    A.    That is what the commentary notes
4    say, yes.
5    Q.    So you believe the judge can inform
6    victims and witnesses of their right to object
7    to being filmed, videotaped, recorded, and
8    photographed, but that does not mean that they
9    have the right to not be filmed, videotaped,
10   recorded, or photographed?
11   A.    I apologize.  Could you re-ask the
12   question?
13   Q.    Sure.
14         You believe, under Rule 12(C), that
15   a judge can inform victims and witnesses of
16   their right to object to being filmed,
17   videotaped, recorded, and photographed, but
18   that does not mean that they get to decide that
19   they are not filmed, videotaped, recorded, or
20   photographed; is that accurate?
21         MR. ROBINSON:  Object to form.
22   BY MS. SARK:
23   Q.    Let me ask it a little bit easier.
24         So you believe 12(C)(2) states that
25   the judge can just inform victims and witnesses

Page 41

1    of their right to object to being filmed,
2    videotaped, recorded, or photographed, correct?
3    A.    That is correct.
4    Q.    But you don't believe that gives the
5    right to victims or witnesses to decide that
6    they do not get to be filmed, videotaped,
7    recorded, or photographed?
8    A.    That is correct.
9    Q.    Okay.  So this issue was actually
10   litigated in the Fourth District Court of
11   Appeals; is that correct?
12   A.    It was.
13   Q.    Can you tell me a little bit about
14   that case?
15   A.    Certainly.
16         Several members of the pool media,
17   including the Scioto Valley Guardian, retained
18   Jack Greiner and his law firm, Graydon, to file
19   a petition.
20         I believe it was -- it may have been
21   a prohibition or it was a mandate, as I can't
22   recall, but it was one of the two, to limit
23   some rules that were imposed by the judge.  One
24   of them was the filming and photographing of
25   evidence that was in the court proceedings.

Page 42

1  Specifically, there was a bloody
2  shoe print that the prosecution was upset that
3  the news media had published.  And the news
4  media felt we were allowed to record that and
5  publish it.  And many members of the media,
6  including the Guardian, published the bloody
7  shoe print.
8  And when we, as the news media, were
9  verbally reprimanded by the Court, I believe it
10 was off the record, that it was inappropriate
11 for us to do so.
12 Members of the news media voted,
13 with their news managers' blessings, to retain
14 the law firm to petition the Fourth District to
15 allow us to record evidence that was being
16 shown on the television, particularly the more
17 gruesome evidence.
18 The prosecution was picking and
19 choosing, at the time, what evidence could and
20 could not be filmed by us.  They would look at
21 the pool operator and say, do not film this.
22 And the media felt that that was inappropriate.
23 So Mr. Greiner, on behalf of the --
24 I believe there were seven to maybe nine
25 members who were part of that case caption, who

Page 43

1  litigated the matter before the Fourth
2  District, asking for permission, and the Fourth
3  District ruled in our favor, that we were
4  allowed to record the evidence.
5  Q.  But that one didn't -- that case did
6  not deal specifically with Rule 12(C), did it?
7  Wasn't there a case that you filed
8  on your own in the Fourth District Court of
9  Appeals?
10 A.  I did file a pro se case in 12 --
11 regarding Rule 12.  And I'm just -- give me a
12 moment here.
13 Q.  Uh-huh.
14 A.  Just to speed things up here,
15 because I'm understanding the question.
16 I filed a petition in the Fourth
17 District asking the Fourth District to rule in
18 favor of my request, to allow us to have
19 hearings and to rule that probable cause be
20 found as to why the person who opted in or out
21 from the witness stand could or should not be
22 recorded, based on the grounds that it may
23 affect the integrity of the trial.
24 Q.  So let me ask this.  Under Rule
25 12(C)(2), you said that you did not believe

Page 44

1  that it gave witnesses and victims the ability
2  to decide not to be filmed, videotaped,
3  recorded, and photographed, correct?
4  A.  That's correct.
5  Q.  So did you believe that you could go
6  against a witness who opts out of being filmed,
7  videotaped, recorded, or photographed?
8  A.  I never believed that a witness was
9  allowed to opt in or out, and I argued that in
10 the petition.
11 Section (C) states that they shall
12 be informed.  It does not state that they have
13 the option to pick one way or the other.
14 Q.  But the commentary notes do state
15 that the filming, videotaping, recording, or
16 taking of photographs of victims or witnesses
17 who object shall not be permitted, correct?
18 A.  The commentary notes state that, but
19 that's not the rule.
20 Q.  So you believed that even if a
21 witness filled out the opt-out form, that
22 members of the media were still allowed to
23 film, videotape, record, or photograph them?
24 A.  That is what my petition to the
25 Fourth District requested to be affirmed, yes.

Page 45

1  Q.  But did you believe that?
2  A.  Yes.
3  Q.  And in the case that you filed on
4  your own, did you have an attorney represent
5  you?
6  A.  I did not.
7  Q.  And you filed that against
8  Judge Deering, correct?
9  A.  That is correct.  I believe you were
10 on the phone for that hearing.
11 Q.  I was.
12 And Judge Deering, at that time, was
13 the judge who was handling the George
14 Wagner, IV case, correct?
15 A.  That is correct.
16 (Deposition Exhibit 24 was marked for
17 identification.)
18 BY MS. SARK:
19 Q.  I'm going to hand you what's been
20 marked as Exhibit 24.
21 Have you ever seen this document
22 before?
23 A.  I have.
24 Q.  Okay.  And can you explain to me
25 what it is?

Page 46

1     A.    May I have a moment to review it?
2     Q.    **Absolutely.**
3     A.    May you ask your question again,
4  please?
5     Q.    **Yes.  Can you tell me what this**
6  **judgment entry is regarding?**
7     A.    Yes.  This is a judgment entry for
8  the Court of Appeals in the Fourth District,
9  Case Number 22917.
10           It's a judgment entry signed by the
11  administrative judge, Michael Hess.  It's
12  revising a previous order that had been issued
13  on October 25th.
14    Q.    **And this is in the case of State of**
15  **Ohio, ex rel. Derek J. Myers versus Honorable**
16  **Randy D. Deering; is that correct?**
17    A.    Correct.
18           And just for the record, it was
19  pertaining to the petition that we just spoke
20  of momentarily, a few moments ago, regarding
21  the Wagner case.  Yes.
22    Q.    **And this is the case that you filed**
23  **on your own, correct?**
24    A.    That is correct.
25    Q.    **You did not have an attorney**

Page 47

1  represent you, correct?
2     A.    Not at the time of filing.
3     Q.    **Okay.  So the first three sentences**
4  **of this order state, This entry revises our**
5  **previous order issued October 25th, 2022 as it**
6  **relates to the photographing and recording of**
7  **witnesses who object to such recording pursuant**
8  **to Superintendence Rule 12(C).  The filming,**
9  **videotaping, recording, or taking of**
10  **photographs of victims or witnesses who object**
11  **shall not be permitted.  The trial judge is not**
12  **required to hold a hearing or make evidentiary**
13  **findings; is that accurate?**
14    A.    That is what it reads.
15    Q.    **So when you petitioned the Court**
16  **with your own interpretation of Superintendence**
17  **Rule 12(C), this entry holds that a witness or**
18  **victim can make the decision not to be filmed,**
19  **videotaped, recorded, or photographed, correct?**
20    A.    That is correct.
21           But, also, for the record, there
22  was, as noted in the very first sentence of
23  Exhibit 24, This entry revises our previous
24  order.
25           So there had been a previous order

Page 48

1  issued by the Fourth District.  And I don't,
2  obviously, have it in front of me, but, to the
3  best of my recollection, it was that
4  Judge Deering was ordered to hold, essentially,
5  what I would call a probable cause hearing as
6  to why a witness who would object if their
7  videotaping would -- or audio recording or
8  photographing would -- how it would impact the
9  integrity of the trial.  And he was then tasked
10  with holding a hearing to find out the probable
11  cause as to why it would or would not affect
12  the integrity of the trial.
13           Mr. Wagner was on the stand
14  preparing to take testimony on the date of
15  October 26, as time stamped.  And I believe you
16  were on the phone for that as well.
17           The -- Judge Deering was holding a
18  hearing, as ordered in the previous entry from
19  Michael Hess of the Fourth District, as to the
20  probable cause, if it would impact the
21  proceedings if Mr. Wagner objected.
22           Mr. Wagner asserted his right to not
23  be filmed, according to Judge Deering.  And
24  Judge Deering ultimately ruled that it would
25  impact the integrity of the trial if

Page 49

1  Mr. Wagner -- excuse me -- if Mr. -- Jake
2  Wagner was going to be recorded.
3           At the conclusion of that hearing,
4  we took a brief recess.  As we were walking out
5  of the courtroom, various members of the news
6  media, including myself, were served a copy of
7  this revised entry that withdrew the process
8  that had just taken place.
9     Q.    **Okay.  So the first entry, the first**
10  **decision that was made by the Fourth District**
11  **Court of Appeals was on October 25th, 2022,**
12  **correct?**
13    A.    I don't recall the date that they --
14  that the first order was issued.  It was --
15    Q.    **Well, the first sentence of this**
16  **judgment entry says, This entry revises our**
17  **previous order issued October 25th, 2022; is**
18  **that accurate?**
19    A.    Okay.  So to answer your question,
20  based on Judge Hess, it would have been -- the
21  first order issued was on October 25th.
22    Q.    **And then what is the time stamp date**
23  **of the current judgment entry that's in front**
24  **of you?**
25    A.    The 26th of October 2022, so a day

Page 50

1    later.

2         Q.    So a day later, this judgment entry
3    that you have in front of you, Exhibit 24, was
4    entered, correct?

5         A.    That's correct, overruling the
6    previous one on the 25th.

7         Q.    Okay.  And the Fourth District Court
8    of Appeals upheld Judge Deering's
9    interpretation of Superintendence Rule 12(C) by
10   finding that the filming, videotaping,
11   recording, and photographing of victims or
12   witnesses who object is permitted?

13        A.    After I received this judgment
14   entry, I no longer pursued the litigation in
15   that case, so I'm not sure exactly what the
16   outcome was.

17             I never ruled -- or I never read the
18   final judgment entry of the case that came
19   several weeks later.

20        Q.    But this judgment entry in front of
21   you says, Pursuant to Superintendence Rule
22   12(C), the filming, videotaping, recording, or
23   taking of photographs of victims or witnesses
24   who object shall not be permitted; is that
25   accurate?

Page 51

1         A.    In this judgment entry, that is
2    correct.  And then we would have to go on.  The
3    pleadings of the complaint would have to be
4    litigated.

5             So this was just a request for a
6    temporary restraining order, essentially.  This
7    wasn't the final outcome of that case.

8         Q.    So did you appeal this decision?

9         A.    I did not.  I stated, once this came
10   out, I withdrew from the proceedings.  And I
11   believe, as you may recall more than I, since
12   you were counsel on that case, I simply just
13   did not respond to any filings.

14             And I believe the Court ended up
15   ruling in favor of Judge Deering, based on the
16   docket that I read.  I never read the actual
17   entries.

18        Q.    So there weren't any other hearings
19   or motions filed after this judgment entry, to
20   your knowledge?

21        A.    There were.  Not by me.  It was by
22   your firm and others, but I didn't read them.

23        Q.    Okay.  So, to your knowledge, the
24   last judgment entry that you read said,
25   Pursuant to Superintendence Rule 12(C), the

Page 52

1    filming, videotaping, recording, or taking of
2    photographs of victims or witnesses who object
3    shall not be permitted; is that correct?

4         A.    That is correct.

5         Q.    Okay.  And it also says, The trial
6    court judge is not required to hold a hearing
7    or make evidentiary findings; is that correct?

8         A.    That is correct.

9         Q.    Okay.  I'm going to show you what
10   I've labeled as --

11             Well, let me ask this first.

12             Did Jake Wagner opt out of being
13   filmed, videotaped, recorded, and/or
14   photographed?

15        A.    He did.

16             (Deposition Exhibit 25 was marked for
17             identification.)

18   BY MS. SARK:

19        Q.    Okay.  I'm going to hand you what's
20   marked as Exhibit 25.

21             Have you ever seen this document
22   before?

23        A.    I don't recall.

24        Q.    Okay.  Can you provide the date that
25   Mr. Wagner signed this at the bottom?

Page 53

1         A.    According to Exhibit 25, the
2    signature of the witness, which appears to be
3    written in by his attorney, Gregory Meyers, is
4    dated for 10-24-2022.

5         Q.    And pursuant to this form, Edward
6    Jake Wagner opted out of being filmed,
7    videotaped, recorded, or photographed, correct?

8         A.    Correct.  It says, That I do object
9    to being filmed, videotaped, recorded, or
10   photographed.

11        Q.    Okay.  Now, it's my understanding
12   that you were not present for all of Jake
13   Wagner's testimony; is that accurate?

14        A.    That is correct.

15        Q.    And you were actually out of the
16   country during part of his testimony, correct?

17        A.    I was.

18        Q.    What days did you leave the country
19   in October of 2022?

20        A.    I don't have my flight itinerary in
21   front of me, but I believe I left Thursday of
22   that week, prior to the 24th.

23        Q.    Let me hand you what we will mark as
24   Exhibit 26.

25

Page 54

1         (Deposition Exhibit 26 was marked for
2              identification.)
3  BY MS. SARK:
4         Q.    Does this look like a copy of your
5  flight itinerary from October of 2020 -- well,
6  when you left the country in October of 2022?
7         A.    That is correct.
8         Q.    Okay.  Can you state for me what
9  days you were gone in October of 2022?
10        A.    Gone from where?
11        Q.    The country.  Out of the country.
12        A.    Oh, yes.  So I left Columbus, Ohio
13 on October 20th, 2022, and I returned back to
14 Columbus, Ohio on Tuesday, October 25th, 2022.
15        Q.    And according to this itinerary, you
16 landed in Columbia on October 21st, I believe?
17        A.    It was shortly after midnight.  So,
18 yes, it legally was the 21st.
19        Q.    Okay.  And then on Monday, the 24th,
20 October 24th, 2022, you left Columbia, correct?
21        A.    The legal date was 11:45 p.m. on the
22 24th.
23        Q.    Did you go by yourself?
24        A.    I did.
25        Q.    I'm going to show you what we will

Page 55

1  mark as Exhibit 27.
2              (Deposition Exhibit 27 was marked for
3              identification.)
4         MS. SARK:  Can we go off the record
5  for a second?
6         (Off the record.)
7         MS. SARK:  We can go back on the
8  record.
9  BY MS. SARK:
10        Q.    Okay.  I've handed you what's been
11 labeled as Exhibit 27; is that accurate, 27?
12        A.    Yes.
13        Q.    Yes.
14              And those are entitled, Plaintiff
15 Responses to Defendants' First Set of Requests
16 for Admissions, Interrogatories, and Requests
17 for Production of Documents to Plaintiff.
18              Have you seen this document prior to
19 today?
20        A.    Yes.
21        Q.    Did you help to prepare the
22 responses in this document?
23        A.    I did prepare the responses in this
24 document.
25        Q.    Okay.  Did you gather the documents

Page 56

1  and recordings in response to the request for
2  production of documents?
3         A.    Is there a particular number that
4  you're referring to?
5         Q.    Well, so defendants sent to you,
6  request for production of documents.
7         A.    Yes.
8         Q.    And I think there were six all
9  together?  Yes, six.
10        A.    I'm just looking here.  It says,
11 provide a -- okay, I see here.  Request for
12 production of documents.  All right.  Provide
13 copies of any documents reviewed.  Okay.
14        Q.    Did -- did you provide documents
15 and/or recordings in response to the request
16 for production of documents?
17        A.    We did.
18        Q.    Okay.  Did you review the responses,
19 prior to providing it to me, to ensure their
20 accuracy?
21        A.    Yes.  I typed them.
22        Q.    Okay.  I'm going to have you look at
23 Interrogatory Number 2.  It is on page 4 -- or
24 page 3.  I'm sorry.
25              And Interrogatory Number 2 states:

Page 57

1  In your Opposition to Defendants' Motion for
2  Judgment on the Pleadings, (Doc.#: 17), you
3  state that you were out of the country on
4  October 24th, 2022.
5              Provide the location where you were
6  on October 24th, 2022, the dates you were at
7  the aforesaid location, when you returned to
8  Pike County, Ohio, and the purpose for
9  traveling out of town.
10              And your response was:  I flew to
11 Bogota, Columbia on October 20th, 2022, and
12 returned to Pike County on October 26th, 2022.
13 The purpose of my travel was to receive dental
14 work and to visit friends.
15              Is this an accurate representation
16 of Interrogatory Number 2?
17        A.    Yes.
18        Q.    What dental work did you have done?
19        MR. MEZIBOV:  A deposition is not
20 supposed to be like pulling teeth.
21        MR. ROBINSON:  Can we go off the
22 record for a second?
23        (Off the record.)
24 BY MS. SARK:
25        Q.    So let me ask you this.  Did your

Page 58

1  flight times change at all from the time you
2  booked the flights to the time the flights
3  actually happened?
4       A.   Not that I recall.
5       Q.   Okay.  So according to your
6  itinerary that you provided to me, you landed
7  in Columbus on October 25th, 2022, correct?
8       A.   That is correct.
9       Q.   Did you, on that same day, go back
10  to the Pike County Courthouse?
11      A.   I did not.
12      Q.   And you went -- scratch that.
13           You went back to Pike County on
14  October 26th, correct?
15      A.   That is correct.
16      Q.   And, at that time, did you go to the
17  trial for George Wagner, IV?
18      A.   I did, yes.  Yes, I did.
19      Q.   Do you recall if Jake Wagner was
20  still testifying that day?
21      A.   He was.  That was the date that you
22  were on the phone and we held the first
23  preliminary, so to speak, preliminary hearing
24  from the first order of the Fourth District
25  saying that Judge Deering had to have hearings.

Page 59

1       Q.   So the recording you received of
2  Jake Wagner's testimony, did you receive that
3  prior to going into the trial on October 26th?
4       A.   I had received the copy some time
5  between the late evening of the 25th and the
6  morning of the 26th.
7            So going into the hearing on the
8  26th, I would have had, in my possession, that
9  recording, yes.
10      Q.   And you were -- you published that
11  recording online, correct?
12      A.   A condensed version, yes.
13      Q.   Okay.  You say a condensed version,
14  so what did you receive?
15      A.   What appeared to be two full days of
16  testimony.
17      Q.   So you received recordings of Jake
18  Wagner's testimony, in its entirety, from
19  October 24th and October 25th, 2022?
20      A.   That is correct.
21      Q.   If you'd go back to your responses
22  to request for production of documents, on
23  Request for Production of Documents Number 3,
24  page 5, I said, Provide a copy of the audio
25  recording of Edward Jacob Wagner's testimony

Page 60

1  that you received from an unidentified source.
2            And the response was, Responsive
3  recording attached.
4       A.   That is correct.
5       Q.   What I received was a
6  10-minute-13-second audio recording, which I
7  will bring up now.
8       A.   May we go off the record?
9            MS. SARK:  Yeah, that's fine.
10           MR. MEZIBOV:  If you want to talk to
11  Emmett, yes.
12           (Off the record.)
13           MS. SARK:  Are we back on?
14  BY MS. SARK:
15      Q.   So we will label this as Exhibit 28.
16  And this is what I received in response to
17  request for Production of Documents Number 3.
18           (The video was played.)
19  BY MS. SARK:
20      Q.   And I just want to play this for a
21  minute so we can get -- to make sure that it's
22  the same audio recording that we were both
23  referring to.
24           So is this the recording you
25  received in its entirety from the unidentified

Page 61

1  source?
2       A.   It is not.
3       Q.   Why was I not provided a copy of the
4  audio recording of Jake's testimony that you
5  received from the unidentified source?
6       A.   Well, it was -- your Request for
7  Production Document Number 3 came well after
8  the publication of the recording.
9            During the date of publication,
10  which was October 2022, when I received the
11  recording, to the date of your Request for
12  Production of Document Number 3, the entire
13  recording two-day audio, that I had said
14  earlier that appeared to be two full days of
15  testimony, was no longer in my possession.
16           And the only thing that remained in
17  my possession, pertaining to any audio
18  recording of this matter, was what you were
19  provided.
20      Q.   So why was it no longer in your
21  possession?
22      A.   I believe that that laptop had been
23  broken.  We had just gotten a new one and lost
24  several files.  I'm not exactly sure what
25  happened.

Page 62

1    Q.   What laptop was it on?  Let me ask
2  that again.
3         What laptop were -- was the -- were
4  the recordings on, from October 24th and 25th?
5    A.   When I had received them, I placed
6  them on my work laptop, which was a MacBook.
7    Q.   Is that the laptop that was seized
8  in this case?
9    A.   It was not.
10        I no longer have that MacBook.  Like
11  I said, it broke.  I lost several files,
12  including the full version of Mr. Wagner's
13  testimony.
14   Q.   And you didn't make any backup
15  copies of that recording -- the recordings that
16  the unidentified source gave you?
17   A.   Well, at the time, there may have
18  been, but they were all stored locally on that
19  computer.
20        I believe, you know, when -- I
21  personally had possession of the audio, and I
22  personally oversaw the condensed version.
23        So there were duplicates made, yes,
24  but they were all locally stored on the
25  computer that no longer exists.

Page 63

1    Q.   Do you recall when that laptop
2  broke?
3    A.   I do not recall, but I do know that
4  it was before the production request.
5    Q.   Okay.  You published the recording
6  of Jake Wagner's testimony in what you called a
7  condensed version, correct?
8    A.   Yes.
9    Q.   Where did you publish that?
10   A.   It was uploaded to, I believe, what
11  we called in -- on the Scioto Valley Guardian's
12  website, we have a platform called Brid Video
13  that hosts our video.
14        It was uploaded to that.  And then
15  it was also, I believe, uploaded to social
16  media, such as Facebook and, perhaps, YouTube.
17   Q.   Was it posted on your personal
18  Facebook page?
19   A.   I had cross-shared it, I believe.
20   Q.   What do you mean by cross-shared it?
21   A.   Facebook has a feature that one page
22  will give permission to another page to share a
23  video.  That way the analytics are aligned.
24        So if you watch a video on one page
25  and a video on the second page, the analytics

Page 64

1  will be combined analytics instead of a
2  separate analytical report.
3         And so I believe the Derek Myers
4  Facebook page, which was a professional page
5  that I used for journalism work, had permission
6  to cross-share it, and I believe I did
7  cross-share it.
8    Q.   Was it common that any article you
9  shared on the Guardian you also shared on your
10  Facebook -- your personal Facebook page?
11   A.   Well, let's clarify what you mean by
12  personal Facebook page.
13   Q.   On your Derek J. Myers Facebook
14  page, was it common to share articles that you
15  had posted on the Guardian?
16   A.   The Derek Myers professional
17  Facebook page is just that, a professional
18  Facebook page.  And it was very common, on a
19  daily basis, routinely to share and cross-post,
20  yes.
21   Q.   Did you have any other Facebook
22  pages for yourself, personally, besides the
23  Derek J. Myers Facebook page?
24   A.   Yes.  You have to have a Facebook
25  account to access a professional page.

Page 65

1    Q.   Okay.  So how many Facebook accounts
2  did you have -- could you access?  Let me ask
3  that.
4    A.   I had one active at the time.
5    Q.   Which was?
6    A.   I believe it was Derek Joel or Joel
7  Derek.
8    Q.   And that was your personal Facebook
9  page?
10   A.   That is correct.
11   Q.   And then your professional Facebook
12  page was Derek J. Myers?
13   A.   It was just Derek Myers, but, yes.
14   Q.   Okay.  Did you post or share the
15  article providing the testimony of Jake Wagner
16  on your personal Facebook page?
17   A.   I don't recall.
18   Q.   At the time you published the
19  article with the audio recording, you were
20  aware that Jake Wagner had opted out of being
21  recorded, filmed, videotaped, and photographed,
22  while testifying, correct?
23   A.   Yes.
24   Q.   Was there any exception that you
25  were aware of that would permit an individual

Page 66

1  or member of the media to record him?
2      A.   No.
3      Q.   Okay.  I'm going to hand you what
4  has been labeled as Exhibit 28.
5          THE REPORTER:  No.
6          MS. SARK:  Or 29.  Sorry.  You're
7  right, yeah.
8          THE REPORTER:  28 was the audio.
9          (Deposition Exhibit 29 was marked for
10         identification.)
11 BY MS. SARK:
12     Q.   Okay.  Have you seen this document
13 before?
14     A.   Yes.  This is a document that we
15 provided to you.
16     Q.   Okay.  And it is reflected at the
17 bottom, Bates stamp Myers 33 through Myers 37,
18 correct?
19     A.   That is correct.  I'm not sure if
20 that's our stamp or yours, but, yes.
21     Q.   The second page in this article --
22 let me find the paragraph.  The second
23 paragraph, it states, Jake Wagner chose not to
24 be video or audio recorded by news media.
25          I'm going to stop there.

Page 67

1          Isn't it accurate that no one was
2  permitted to video or audio record Jake
3  Wagner's testimony?
4      A.   I wouldn't say no one.  The court
5  reporter was recording his audio.
6      Q.   Okay.  Besides the court reporter,
7  was there anyone, that you knew of, that was
8  permitted to video or audio record Jake
9  Wagner's testimony?
10     A.   Not to my knowledge.
11     Q.   So it wasn't just the news media
12 that was not allowed to video or audio record,
13 correct?
14     A.   Correct.
15     Q.   And then the article states, Derek
16 Myers -- it's in that same sentence.  Derek
17 Myers won a temporary restraining order which
18 forced presiding Judge Randy Deering to allow
19 the filming of witnesses unless the judge felt
20 the filming would compromise the integrity of
21 the trial.
22          This isn't -- that's not accurate,
23 correct?
24     A.   Let me read it for myself, please.
25     Q.   Okay.

Page 68

1      A.   That is accurate.
2      Q.   So the Fourth District Court of
3  Appeals' opinion, that we just looked at,
4  Exhibit 24 --
5      A.   Yes.
6      Q.   -- that specifically states that the
7  filming, videotaping, recording, or taking
8  photographs of victims or witnesses who object
9  shall not be permitted.  The trial court judge
10 is not required to hold a hearing or make
11 evidentiary findings.
12          Is that what that judgment entry
13 states?
14     A.   It does state that.  But it also
15 states that it's a revision to a previous order
16 from October 25th.
17          And the order on October 25th said
18 that Derek Myers had won a restraining order,
19 essentially -- I'm paraphrasing, but it says --
20 and I'm summarizing the order, but the previous
21 order from October 25th says that Judge Deering
22 had to hold the hearing.
23          In fact, Judge Deering did hold a
24 hearing and you were on speakerphone for that
25 hearing.

Page 69

1      Q.   And you said you received a copy of
2  this judgment entry, you believe, after you
3  exited the court for that hearing on
4  October 26th, 2022, correct?
5      A.   That's correct.
6      Q.   Okay.  Can you tell me what date
7  this article was published in Exhibit 29?
8      A.   According to the dateline,
9  October 28th.
10     Q.   So when you published this, you knew
11 that it was inaccurate that you claim you won a
12 temporary restraining order which forced Judge
13 Randy Deering to allow the filming of witnesses
14 unless the judge felt the filming would
15 compromise the integrity of the trial, correct?
16         MR. ROBINSON:  Objection to form.
17 BY MS. SARK:
18     Q.   Do you want me to ask it
19 differently?  Derek, would you like me to ask
20 it differently?
21     A.   Please ask the question again.
22     Q.   Okay.  So this article was published
23 October 28th, 2022, correct?
24     A.   This article was published
25 October 28th, 2022.

1    Q.   And in this article, you say that
2 you won a temporary restraining order, which
3 forced Judge Deering to allow the filming of
4 witnesses unless the judge felt the filming
5 would compromise the integrity of the trial; is
6 that accurate?
7    A.   It is accurate.
8    Q.   Okay.  But that is not true, right?
9    A.   It is true.  There was an entry on
10 October 25th, 2022, by the Fourth District,
11 that said that Judge Deering would have to hold
12 hearings.
13         And there was a subsequent hearing
14 held on the 26th.  And you were present on
15 speakerphone for that hearing.
16    Q.   But the October 26th, 2022 judgment
17 entry revised the October 25th, 2022 judgment
18 entry, correct?
19    A.   The October 6th (sic) judgment entry
20 revised the order issued on October 25th.
21    Q.   I think you said October 6th.
22 October 26th?
23    A.   October 26th revised the order for
24 October 25th, correct.
25    Q.   So when you published this article

1 on October 28th, 2022, you knew that the
2 judgment entry from October 26th, 2022, stated
3 that Judge Deering did not have to hold a
4 hearing regarding witnesses who opt out of
5 being filmed, videotaped, recorded, or
6 photographed, correct?
7    A.   Yes.  The entry was revising the
8 order from the 25th that said that he had to.
9    Q.   That said he had to what?
10    A.   Hold a hearing on Wednesday morning.
11         Well, it didn't say Wednesday
12 morning, but he held -- he chose to hold the
13 hearing on Wednesday morning.
14    Q.   Let me ask this again.
15         When you published this on
16 October 28th, 2022, this news article, you knew
17 what the judgment entry from October 26th, 2022
18 said, correct?
19    A.   Correct.
20    Q.   Which said, the trial judge is not
21 required to hold a hearing or make evidentiary
22 findings, correct?
23    A.   That is correct.
24    Q.   Okay.  To your knowledge, there was
25 nothing that ever permitted Jake Wagner's

1 testimony to be filmed, right?
2    A.   Sorry.  Could you re-ask your
3 question?
4    Q.   To your knowledge, there was no
5 exception that ever permitted Jake Wagner's
6 testimony to be filmed, correct?
7    A.   Correct.
8    Q.   To your knowledge, there was no
9 exception that ever permitted Jake Wagner's
10 testimony to be streamed, correct?
11    A.   Correct.
12    Q.   To your knowledge, there was no
13 exception ever permitted that would allow Jake
14 Wagner's testimony to be videotaped, correct?
15    A.   Could you re-ask the question?
16    Q.   Yeah.
17         To your knowledge, there was never
18 any exception that permitted Jake Wagner's
19 testimony to be videotaped?
20    A.   That's correct.
21    Q.   And, to your knowledge, there was
22 never any exception that permitted Jake
23 Wagner's testimony to be recorded, correct?
24    A.   With the exception of the court
25 reporter, that is correct.

1    Q.   The third paragraph down in that
2 article you published, Exhibit 29, it states,
3 The Guardian received a portion of Jake
4 Wagner's testimony on his first day on the
5 witness stand.
6    A.   So that's paragraph five, but in
7 paragraph three on that page.
8    Q.   Correct.
9    A.   And you would -- it says, The
10 Guardian received a portion of Jake Wagner's
11 testimony on his first day on the witness
12 stand.  That is correct.
13    Q.   So I thought you had stated
14 previously that you received audio recording
15 from Jake Wagner's testimony from his first and
16 second day on the witness stand; is that
17 correct?
18    A.   That is correct.
19    Q.   And then the next sentence says, The
20 Guardian wants to disclose that the audio was
21 not recorded by a member of the media and was
22 submitted to the Guardian's newsroom by a
23 courthouse source who is authorized to have
24 their cell phone in the room.
25         Is that accurate, what I read?

Page 74

1     A.   Yes.

2       Q.   Was the audio provided to you,

3 specifically or the newspaper?

4     A.   As answered in -- for request for

5 documents and your interrogatories, it was left

6 on my desk between the late evening of the 25th

7 and the 26th.

8       Q.   You weren't present during the first

9 day of Jake Wagner's testimony, correct?

10    A.   That is correct.  I was out of the

11 country.

12      Q.   So how did you know the recording

13 was from the first day?

14    A.   Based on the reporting from other

15 media outlets, it was clear that the words that

16 he was stating -- because he had been directly

17 quoted by some of the other media outlets,

18 specifically the Cincinnati Enquirer had

19 directly quoted Mr. Wagner.  Those quotes were

20 verbatim in the audio.

21      Q.   So if you had the recording and you

22 could directly quote it, why did you not choose

23 to directly quote it instead of publishing the

24 recording of Jake Wagner's testimony?

25    A.   I'm sorry.  Can you re-ask or

Page 75

1 rephrase the question?

2      Q.   Sure.

3          Since you had the recording of Jake

4 Wagner's testimony, why did you choose not to,

5 like other news sources, directly quote it, and

6 instead publish the actual testimony of Jake

7 Wagner?

8    A.   Well, it was ten minutes of audio.

9 I'm not a transcriptionist.  And, frankly, we

10 have learned that our demographic likes to

11 watch videos and audio instead of reading

12 lengthy transcripts.  That is a trend in

13 society today for news publications worldwide.

14        And so the video -- there is no need

15 to, in my judgment, personal judgment, there's

16 no need to quote it when somebody can simply

17 click play above it and listen to it.

18      Q.   But you could have directly quoted

19 Jake Wagner's testimony, correct?

20    A.   Well, sure.  Yes.

21      Q.   Prior to this trial, do you --

22 strike that.

23        Prior to the trial, did you know the

24 person who, in this case is the unidentified

25 source, who recorded the testimony of Jake

Page 76

1 Wagner?

2    A.   Can you re-ask the question, please?

3      Q.   Yes.

4        Did you know the person, prior to

5 trial, who recorded the testimony of Jake

6 Wagner?

7        MR. MEZIBOV:  I'm going to object to

8 the form of the question --

9        MS. SARK:  Okay.

10       MR. MEZIBOV:  -- the substance of

11 it.  I think it's a little confusing.

12 I'm not sure whether you're asking him

13 whether he knew beforehand --

14       MS. SARK:  Okay.

15       MR. MEZIBOV:  -- that somebody was

16 going to record it.

17       MS. SARK:  I can rephrase it.

18       MR. ROBINSON:  We need to know, you

19 know, whether he even knows who the

20 person was.

21       MS. SARK:  Right.  And that's what

22 I'm trying to get at.  Yeah, yeah, yeah.

23 BY MS. SARK:

24      Q.   So, clearly, somebody recorded the

25 testimony of Jake Wagner and provided that to

Page 77

1 you, correct?

2    A.   That is correct.

3      Q.   That's what you're claiming,

4 correct?

5    A.   That is what happened, yes.

6      Q.   The person who recorded the

7 testimony, did you know that person prior to

8 the trial of Jake Wagner?

9        MR. MEZIBOV:  I think the confusion

10 is whether you're asking him did he know,

11 before the trial, that a person was going

12 to record it --

13       MS. SARK:  No.

14       MR. MEZIBOV:  -- or did he

15 learn after the --

16       MS. SARK:  Did he know the actual

17 person.  He's claiming somebody recorded

18 the testimony.

19       MR. MEZIBOV:  Right.

20       MS. SARK:  Did he know the person

21 who recorded the testimony?

22       MR. MEZIBOV:  Okay.

23       MR. ROBINSON:  I think we need a

24 foundation of whether he knows who

25 recorded it before we can know if he knew

1    them before it was recorded.
2            MS. SARK:  Okay.
3            MR. MEZIBOV:  That's the confusion.
4    BY MS. SARK:
5        **Q.   So do you know who recorded the**
6    **testimony of Jake Wagner?**
7        A.   I have my speculations, but if I did
8    know, I would not be able to tell you.
9        **Q.   And I don't want the names.  I'm**
10   **just asking if you know who the person is that**
11   **recorded Jake Wagner's testimony?**
12       A.   As I stated, I have my speculations.
13   And if I did know, I would not be able to tell
14   you.
15       **Q.   Okay.  That still doesn't answer my**
16   **question.  I need a yes or no.**
17           **Do you know who the person is that**
18   **recorded Jake Wagner's testimony?**
19       A.   My answer to your question is, I
20   have speculation.  And if I did or did not
21   know, I would not be able to tell you.
22           That is my answer.
23       **Q.   When you say you have speculations,**
24   **what are your speculations based upon?**
25       A.   We live in a small community.  We

1    have sources.  And not everyone would have
2    access to the courtroom, particularly on the
3    days of testimony.
4            I believe the courtroom's capacity,
5    after the fire marshal was called, was
6    somewhere in the vicinity of 90.  So we know
7    that it was down to a pool of 90 people.
8        **Q.   So you will not answer yes or no**
9    **whether you knew who the person was that**
10   **recorded the testimony?**
11           MR. MEZIBOV:  I'm going to object,
12           because I think -- if you allow me
13           this -- I think what he's telling you is
14           he can speculate as to who it is, but
15           that does not -- that's not the same as
16           having actual knowledge of who did it.
17           MS. SARK:  And that's my question,
18           yes or no, because if he -- if he doesn't
19           have actual knowledge, his answer would
20           be no, I don't know who did it.
21           MR. MEZIBOV:  I don't think you've
22           asked him if he had actual knowledge.
23           Maybe I'm wrong.
24           Why don't you ask him that question?
25   BY MS. SARK:

1        **Q.   Okay.  Do you have actual knowledge**
2    **as to who recorded the testimony of Jake**
3    **Wagner?**
4        A.   I was out of the country.  I wasn't
5    present for the recording.
6        **Q.   That wasn't my question.**
7            **Do you have actual knowledge who**
8    **recorded the testimony of Jake Wagner?**
9        A.   Again, with all respect, I was not
10   present for the recording, so I could not tell
11   you who was recording or not recording.
12           MS. SARK:  Can we go off the record
13           for a minute?
14           (Off the record.)
15           MR. MEZIBOV:  Your questions are
16           getting to an area which we may need to
17           invoke privilege.  It's under Ohio
18           Revised Code 2739.2.
19           MS. SARK:  Okay.
20           MR. MEZIBOV:  That's the Shield Law.
21           MS. SARK:  Okay.
22           MR. MEZIBOV:  We don't have any
23           problems with the questions you've asked
24           to this point.
25           MS. SARK:  Okay.

1            MR. MEZIBOV:  And he's told you he
2            has suspicions.
3            But what we're going to object to is
4            any question which is intended to or
5            seeks to unpack those suspicions.
6            MS. SARK:  Okay.
7            MR. MEZIBOV:  They're based on who
8            he may thinks.
9            MS. SARK:  Yeah.
10           MR. MEZIBOV:  So just please
11           understand that we would invoke that
12           privilege.
13           MS. SARK:  That's fine.
14           MR. MEZIBOV:  Okay.
15           MS. SARK:  That's fine.  Sounds
16           good.
17   BY MS. SARK:
18       **Q.   Okay.  So ask my question again.**
19           **Do you have actual knowledge as to**
20   **who recorded the testimony of Jake Wagner?**
21       A.   I do not.
22       **Q.   Okay.  So your understanding was**
23   **that the recording was just left on your desk,**
24   **correct?  The recording of Jake Wagner's**
25   **testimony was just left on your desk, correct?**

Page 82

1    A.   That is correct.
2         Q.   Did this person reach out, prior to
3    leaving the recording on your desk?  Scratch
4    that.
5         Did this person contact you prior to
6    leaving the recording on your desk?
7         MR. MEZIBOV:  You can answer that.
8    A.   You're assuming that I know the
9    person.
10   BY MS. SARK:
11        Q.   I'm -- I'm asking if anybody
12   contacted you about the recording of Jake
13   Wagner's testimony, prior to you receiving it.
14   A.   I was -- I was not contacted prior
15   to.  I walked in to my desk, and there it was.
16        Q.   Okay.  So I am going to bring up
17   what we will list as Exhibit 30.
18        And I am going to play this in its
19   entirety.
20        (The video was played.)
21        MR. MEZIBOV:  How long is this?
22        MS. SARK:  It is 13 minutes,
23   14 minutes.  I'm asking questions
24   throughout.
25        MR. MEZIBOV:  May we take a --

Page 83

1         MS. SARK:  Yeah.  Yeah, absolutely.
2         MR. MEZIBOV:  -- make a run?
3         MS. SARK:  Absolutely.
4         MR. MEZIBOV:  Thank you.
5         (A recess was taken from 2:07 to 2:15.)
6    BY MS. SARK:
7         Q.   I'm just going to play it for a
8    couple minutes, then I'll ask some questions.
9         (The video was played.)
10   BY MS. SARK:
11        Q.   Do you recall this interview?
12   A.   Yes.
13        Q.   Okay.  Who was this interview with?
14   A.   The Young Turks.
15        Q.   Which -- what is the Young Turks?
16   A.   It is a news organization.
17        Q.   Did they contact you about this
18   interview?
19   A.   I have an existing relationship with
20   this organization.
21        I don't recall who contacted who,
22   how it got on their radar, if I sent to them or
23   what.
24        Q.   Okay.  Did this interview occur
25   after you voluntarily turned yourself in?

Page 84

1    A.   Yes.
2         Q.   Okay.
3         (The video was played.)
4    BY MS. SARK:
5         Q.   So let's stop it right there.
6         So you said, previously, nobody
7    contacted you prior to providing the recording
8    of Jake Wagner's testimony, correct?
9    A.   That's correct.
10        Q.   So why did you say, in your
11   interview, that you had an email from a source
12   regarding Jake Wagner's testimony being
13   recorded?
14   A.   I had just gotten in from -- another
15   trip from Bogota.  This -- I was actually in an
16   Airbnb in Orlando.  I had been up for several
17   hours.  As you can see, I was quite exhausted.
18        So I don't recall.  A lot of this
19   interview there's projection and insinuations
20   is that just simply are not factual to the
21   facts of the actual proceedings and complaint
22   in this case.
23        Q.   So you lied in the interview; is
24   that correct?
25   A.   I didn't lie knowingly.  It was a

Page 85

1    very heated live interview, which was very
2    stressful.  It was hard to remember and recall
3    all the facts at the time.
4         Q.   So did you receive an email from an
5    individual regarding the testimony of Jake
6    Wagner?
7    A.   Upon reflection, no.
8         Q.   Let me -- let's look at Exhibit 27
9    really quickly.  And it will be Interrogatory
10   Number 3 on page 3.
11        And Interrogatory Number 3 says,
12   State how the audio of Edward Jake Wagner's
13   testimony was provided to you (via email, in
14   person, etc.)
15        Response:  A copy of the audio was
16   left on my desk while I was away.
17        Is that a correct reading of
18   Interrogatory Number 3 and your response?
19   A.   Yes.  And the difference, Casey,
20   between this interrogatory request for
21   admissions and the audio that you're playing,
22   is that the request for admissions is under
23   oath, and I do not lie under oath.  I would not
24   lie under oath.  Whereas, the audio was not
25   under oath.

1  Q.  But you still lied?

2  A.  Not knowingly.

3  Q.  Interrogatory Number 6, on the next

4  page, states, Provide the date you received the

5  recording, from an unidentified source, of

6  Edward Jake Wagner's testimony.

7  Your response:  I found a copy of

8  the recording on my desk sometime between the

9  late evening of October 25th, 2022, and the

10  morning of October 26th, 2022.

11  Is that an accurate reading of

12  Interrogatory Number 6 and your response?

13  A.  Yes.

14  Q.  Do you know if -- tell me about how

15  you discovered the audio on your desk.

16  A.  I walked in and there it sat.

17  Q.  When you say there it sat, do you

18  mean a jump drive?  Do you mean a CD?

19  A.  What we would know as a jump drive

20  or a flash drive.

21  Q.  Does your office have cameras?

22  A.  At that time, no.

23  Q.  So how did that person get into your

24  office to leave the audio recording?

25  A.  I don't know.  I was out of the

1  country.

2  Q.  Does your desk have your name on it?

3  A.  I can't recall if I had a nameplate

4  at the time or not.

5  Q.  So you don't know how that person

6  just found your desk and put the audio

7  recording on it, correct?

8  A.  I am unaware if the person knew

9  whose desk it was or wasn't.  Like I said, I

10  wasn't privy to the placement of it.

11  Q.  Did you have exterior cameras --

12  A.  No.

13  Q.  -- at that time?

14  A.  No, we did not.

15  Q.  And you weren't present at your

16  office when this person dropped off the audio

17  recording, correct?

18  A.  That is correct.

19  Q.  Did you ever ask anyone to record

20  the testimony of Jacob Edward Wagner?

21  A.  No.

22  Q.  Did you ever tell anyone you would

23  compensate them with money or any other

24  incentive to record the testimony of Jacob

25  Edward Wagner?

1  A.  No.

2  Q.  Okay.  Let's -- are you fine if

3  we -- well, let's play a little bit more, and

4  then we'll --

5  (The video was played.)

6  BY MS. SARK:

7  Q.  Okay.  So I'm going to fast-forward

8  this a little bit, unless you want to play it

9  in its entirety, Mr. Myers?

10  A.  I'm sorry.  What is the question?

11  Q.  Are you fine if we forward through

12  this, or would you like to play it in its

13  entirety?

14  MR. MEZIBOV:  Just forward what you

15  want to ask questions.

16  MS. SARK:  Okay.

17  MR. MEZIBOV:  Then we can have it

18  played back.

19  MS. SARK:  Okay.

20  BY MS. SARK:

21  Q.  I don't have my glasses on, so I

22  need to scooch it over.

23  (The video was played.)

24  BY MS. SARK:

25  Q.  Okay.  You said the person who

1  recorded this was not a journalist; is that

2  accurate?

3  A.  Yes.

4  Q.  And let's go back to Exhibit 29, the

5  article you wrote in the Scioto Valley

6  Guardian.  And it's the third paragraph on the

7  second page.

8  The Guardian received a portion of

9  Jake Wagner's testimony on his first day on the

10  witness stand.

11  That second sentence states, The

12  Guardian wants to disclose that the audio was

13  not recorded by a member of the media and was

14  submitted to the Guardian's newsroom by a

15  courthouse source who's authorized to have

16  their cell phone in the room; is that accurate?

17  MR. ROBINSON:  Objection to form.

18  BY MS. SARK:

19  Q.  Is that what the second sentence in

20  the third paragraph reads for Exhibit 29?

21  A.  That is what it reads.

22  Q.  Okay.  So if you -- strike that.

23  Your testimony today is that you do

24  not have actual knowledge as to who recorded

25  the testimony of Jacob Edward Wagner; is that

Page 90

1  correct?
2      A.  That's correct.
3      Q.  So then how can you explain that in
4  your article you stated that the individual is
5  not a member of the media and was authorized to
6  have their cell phone in the courtroom?
7      A.  Members of the news media were not
8  authorized to have their cell phones in the
9  courtroom.
10         So speaking on behalf of the ethics
11  of all journalists nationwide, I can state that
12  none of us would violate the code or the order
13  of the judge, knowingly.
14         Therefore, I had worked alongside
15  these people for six weeks; some of them I had
16  known for many years.
17      Q.  But you took your cell phone into
18  the courtroom, right?
19      A.  When?
20      Q.  During the incident with Jason
21  Frazier?
22      A.  In the acting capacity of the pool
23  reporter, that is correct.
24      Q.  So you didn't know, for a fact, when
25  you published this article, that the person who

Page 91

1  recorded this was not a member of the media,
2  did you?
3      A.  Can you restate your question,
4  please?
5      Q.  Sure.
6         Your testimony today is that you do
7  not have any actual knowledge as to who
8  recorded the testimony of Jake Wagner, correct?
9      A.  That's correct.
10      Q.  So you can't say that this
11  individual was not a member of the media, can
12  you?
13      A.  I felt comfortable in my recording
14  to say that no member of the news media -- that
15  I had worked alongside my colleagues long
16  enough to know that none of us would ethically
17  violate the order or any ethics or Court order.
18         So I felt comfortable putting that
19  in my article, and I feel comfortable saying
20  that today.
21         The journalists I worked with are
22  respectable, reputable journalists.  Some of
23  them have very high accolades and awards and
24  have been in this industry for a very long
25  time.

Page 92

1         I have no reason to believe, for a
2  single second, that any of them, including
3  myself, would violate the Court order.
4      Q.  Were -- was the general public
5  permitted to have their cell phones in the
6  courtroom?
7      A.  I'm not sure.  I know some of the
8  family members and the victims' advocate had
9  their phones.
10      Q.  In this article, you also say that
11  you -- the recording of Jake Wagner's testimony
12  was submitted by a courthouse source who was
13  authorized to have their cell phone in the
14  room, correct?
15      A.  That is what it reads, yes.
16      Q.  So if you don't know who recorded
17  the testimony of Jake Wagner, how can you
18  affirmatively say that it was a courthouse
19  source authorized to have their cell phone in
20  the courtroom?
21      A.  As I previously stated, we have
22  audio from the testimony --
23      Q.  Uh-huh.
24      A.  -- that was clearly recorded from
25  within the courtroom.  And I felt it was

Page 93

1  appropriate, and confident in my reporting,
2  when I authored this article known as
3  Exhibit 29, that it was not a member of the
4  news media, because these are people who I know
5  quite well, and none of us would smuggle an
6  audio recording device in.
7         Therefore, it only left a courtroom
8  source who was authorized to have their cell
9  phone in the room.
10      Q.  But couldn't it have been someone in
11  the general public that recorded the testimony
12  of Jake Wagner?
13         MR. MEZIBOV:  Objection.
14         Calls for speculation.
15  BY MS. SARK:
16      Q.  Do you need me to repeat the
17  question?
18      A.  No.  I'm just thinking how to phrase
19  the answer here.
20         Courthouse source does not
21  necessarily mean an employee of the government.
22  A courthouse source could very well mean
23  anybody within the confines of the building.
24      Q.  Well, who was authorized to have
25  their cell phone in the courtroom during

Page 94

1  testimony?
2      A.  I don't have a full list nor do I
3  know.  But as I mentioned, I saw several
4  people, including the general public, defense
5  attorneys, police officers, victims' advocates,
6  and members of the family.
7      Q.  So you don't know who was permitted
8  to have their cell phone in the courtroom
9  during testimony?
10     A.  We know what the order states, is
11 that the media was not allowed.
12     Q.  And my question is:  How can you
13 affirmatively state, then, in your article,
14 that the source that provided the recording was
15 authorized to have their cell phone in the
16 courtroom?
17         MR. ROBINSON:  I don't know if this
18     helps.  It says, it was submitted to the
19     Guardian by a courthouse source.
20         MS. SARK:  Right.
21         MR. ROBINSON:  Not that it was
22     recorded by a courthouse source.
23         MS. SARK:  Okay.
24         THE WITNESS:  That's what I was
25     trying to say.  I was waiting for her to

Page 95

1      lay the foundation, but thank you.
2  BY MS. SARK:
3      Q.  So is the person who submitted the
4  recording different from the person who
5  recorded Jake Wagner's testimony?
6         MR. MEZIBOV:  To your knowledge.  If
7      you know.
8      A.  I don't know.
9  BY MS. SARK:
10     Q.  And then my question goes back to,
11 if you don't know who -- scratch that.
12     You don't know who recorded the
13 testimony of Jake Wagner, correct?
14     A.  I have my speculations.
15     Q.  Okay.  You don't know who
16 recorded -- who submitted the recording of Jake
17 Wagner's testimony, correct?
18         MR. ROBINSON:  You can answer.
19     A.  Can you ask the question again,
20 please?
21 BY MS. SARK:
22     Q.  You don't know who recorded the
23 testimony of Jake Wagner, correct?
24     A.  That is correct.
25     Q.  You don't know who submitted the

Page 96

1  recording of Jake Wagner, assuming that they
2  are two separate people, correct?
3      A.  I had my suspicions, but if I did
4  know, I could not tell you.
5      Q.  Okay.  Do you suspect that the same
6  person recorded and submitted the testimony of
7  Jake Wagner?
8      A.  I can't speculate one way or the
9  other.
10     Q.  Then how can you affirmatively say
11 in your article that the person who submitted
12 the recording of Jake Wagner was authorized to
13 have their cell phone in the courtroom?
14         MR. MEZIBOV:  Let me object again,
15     and I'm going to go back to what my
16     statement was earlier.
17         We believe that under the statute
18     that we cited, the Ohio Shield Law, that
19     Mr. Myers is privileged not to answer
20     questions that may lead to a chain of
21     evidence producing the source.
22         MS. SARK:  Yes.  And I understand
23     that.  But he is claiming he doesn't even
24     know the source.
25         So my question is, then, how can you

Page 97

1  affirmatively say in your article that
2  you know it is someone who is authorized
3  to have their cell phone if you don't
4  know who the source is.
5         MR. MEZIBOV:  Well, I think he's --
6      I understand your question, but I think
7      he's answered it.
8         He answered it by saying, I have
9      eliminated, in my mind, the entirety of
10     the journalists who were reporting on
11     this case.
12         So that would have left somebody
13     else in that courtroom who was permitted
14     to bring a cell phone in, but he did not
15     know who it was.
16         And he did not know whether it was a
17     member of the public or somebody else who
18     wasn't a journalist.
19         So I think he was just trying to --
20     that's his testimony -- limit the scope
21     of the universe that might have been the
22     source.
23 BY MS. SARK:
24     Q.  So let me ask this.
25     Was the general public permitted to

Page 98

1  have their cell phones?
2       A.   I don't know.  I saw members of the
3  general public have their cell phones, yes.
4       Q.   Who was authorized, to your
5  knowledge, to have their cell phones?
6       A.   I would not know.  I saw several
7  people have their cell phones.  If they were
8  authorized or not authorized, I'm unsure.
9            To the best of my knowledge, it was
10 law enforcement officials, attorneys, the
11 victim witness, the court reporter, the court
12 producer for Court TV, who had been absent at
13 this time, and I'm not sure who else.
14      Q.   So when you published this article,
15 you really didn't know if the person who
16 submitted the testimony of Jake Wagner was
17 authorized to have their cell phone in the
18 courtroom?
19           MR. MEZIBOV:  Objection, subject to
20      my previous comments.
21           But you can answer.
22      A.   Again, it's speculation, and I have
23 my ideas of who the source was, but if I did
24 know, I couldn't tell you.
25 BY MS. SARK:

Page 99

1       Q.   So you made this affirmative
2  statement, that the audio was not recorded by a
3  member of the media and was submitted to the
4  Guardian's newsroom by a courthouse source who
5  is authorized to have their cell phone in the
6  room, just based on your assumptions, correct?
7       A.   I have full confidence in my
8  colleagues that they would not violate the
9  Court order.  And, therefore, that's why I
10 wrote, no member of the media recorded it.
11           As for who submitted it to the
12 newsroom was by a courthouse source, it was
13 clearly somebody who was within the courthouse
14 that had access to it.  If they are one and the
15 same --
16      Q.   But this statement was just based on
17 your assumptions, correct?
18      A.   Again, I think I've answered your
19 question.  I can answer and rephrase it
20 20 different ways.
21      Q.   I'm just looking for a yes or no.
22           Was this statement based on your
23 assumptions?
24      A.   Well, I get that you're looking for
25 a yes or no, but you don't get to tell me how

Page 100

1  to answer my questions.
2            And so I'm answering my questions
3  the way that I'm answering them and that is how
4  I have answered them, and that is how I'm going
5  to continue to answer them.
6       Q.   So you don't know who submitted the
7  recording of Jake Wagner's testimony?
8            MR. MEZIBOV:  Objection.
9            Asked and answered.
10      A.   I have my projections and beliefs,
11 but I could not tell you if I did know.
12 BY MS. SARK:
13      Q.   And you do not know who was
14 authorized to have their cell phone in the
15 courtroom, correct?
16      A.   As previously stated, I named a
17 series of people who had their phones in the
18 courtroom.
19           (The video was played.)
20 BY MS. SARK:
21      Q.   I think I'm done on that one.
22           Okay.  Let's move on to your cell
23 phone.
24           You claim that your cell phone was
25 illegally searched and seized in this matter,

Page 101

1  correct?
2       A.   It was illegally seized, that is
3  correct.
4       Q.   And when did the illegal -- illegal
5  seizure occur?
6       A.   It was, I believe, around the -- let
7  me -- without giving a date, because I don't
8  want to misstate, it was the day of my
9  arraignment in the county court, or what most
10 counties would call their municipal court.  I
11 believe it may have been November 2nd.
12      Q.   Do you recall where this happened?
13      A.   The seizure?
14      Q.   Yes.
15      A.   Yes.  It happened at the
16 magnetometer in the lobby of the Pike County
17 Courthouse.
18      Q.   Okay.  And before you went
19 through -- we'll call it the metal detector.
20 Before you went through the metal detector, did
21 you have to take things out of your pockets?
22      A.   Yes.
23      Q.   What did you have to take out of
24 your pockets?
25      A.   I emptied everything out of my

Page 102

1 pockets. I don't know what they would expect
2 you to take out, but I always took out
3 everything.
4 **Q. Okay. Did you take out your cell**
5 **phone?**
6 A. Yes.
7 **Q. And where did you place your cell**
8 **phone?**
9 A. There was a video of it. I don't
10 recall. They had bins. It probably had gone
11 into a bin or it might have laid directly on
12 the conveyor belt. I don't recall.
13 **Q. Okay. And then walk me through what**
14 **happened after your cell phone either was just**
15 **in a bin or went through the conveyor belt.**
16 A. Yeah. So there was a man by the
17 name of Captain Burchett sitting at the desk,
18 manning the security desk that day.
19 Mr. Burchett has -- I'm picking up
20 my items, I believe, from the conveyor belt or
21 from the dish or whatever, and -- or perhaps he
22 had it in his hand. I can't recall.
23 But some statements were made. And
24 I'm paraphrasing here, but the statements were
25 made, you need to take that back outside, by

Page 103

1 Mr. Burchett.
2 And I said, I'm going down to the
3 media room, not upstairs.
4 And he says, no. You need to take
5 it back outside.
6 And I said, again, I'm going to the
7 media room where we're allowed to have our
8 phones.
9 And he said, on second thought, I
10 think I have a search warrant for this. And he
11 placed it behind him.
12 And I proceeded to go to the media
13 room without my cell phone.
14 **Q. After your phone went through the**
15 **conveyor belt, did you ever put it back on your**
16 **person?**
17 A. I can't recall. Like I said, we
18 have CCTV video of that. If you want to play
19 it to refresh my memory, that would help.
20 **Q. Yeah. We'll play that. We will**
21 **label this next one as Exhibit 31.**
22 (The video was played.)
23 BY MS. SARK:
24 **Q. So you're seen there emptying out**
25 **your pockets, correct?**

Page 104

1 A. That's correct. I would have taken
2 everything out.
3 **Q. And you go through the metal**
4 **detector, correct?**
5 A. Yeah. My belt is what led the metal
6 detector to go off.
7 **Q. I don't judge. My high heels do it**
8 **every time, too.**
9 A. You see there, Mr. Burchett hands me
10 everything.
11 **Q. Let me pause it.**
12 **Is that your cell phone that he**
13 **places behind him?**
14 A. Correct.
15 **Q. Okay. So after it went through the**
16 **conveyor belt, you were talking to Captain**
17 **Burchett, and he puts your cell phone behind**
18 **him, correct?**
19 A. Yeah. Our dialogue back and forth,
20 as I was paraphrasing, was he needs -- he says
21 to me, you need to take it back outside.
22 And I said, I'm going down to the
23 media room. We're obviously permitted to have
24 our cell phones.
25 **Q. Uh-huh.**

Page 105

1 A. And I reiterated that twice, I
2 believe.
3 And then he said, on second thought,
4 I think I have a search warrant for this. And
5 he placed it behind him.
6 **Q. Okay.**
7 A. So the -- the brief exchange that
8 you cannot hear but that you see occurring, is
9 that of what I just stated.
10 MS. SARK: Let me just look over
11 some notes really quickly. We're almost
12 done. I probably have less than
13 five minutes left.
14 So we'll just go off the record.
15 (A recess was taken from 2:46 to 2:47.)
16 BY MS. SARK:
17 **Q. Okay. Let's go back to Exhibit --**
18 **I'm sorry -- Exhibit 27. And it is**
19 **Interrogatory Number 4 on page 3.**
20 **And it states, Interrogatory Number**
21 **4: The Complaint, in footnote 2, claims that**
22 **you believe and therefore aver that the county**
23 **prosecutor represented to a third party on the**
24 **date of the dismissal that he was not in favor**
25 **of the criminal prosecution against you and you**

Page 106

1 had no intention of further pursuing the
2 matter. Please provide the name of the
3 individuals you obtained this information from.
4          Your response, Deborah Barrington.
5          Is that an accurate reading of
6 Interrogatory Number 4 in your response?
7     A.    Correct.
8     Q.    Who is Deborah Barrington?
9     A.    Deborah Barrington was part of my
10 defense team that we called the dream team.
11 She was stand-in counsel.
12          Obviously, these proceedings move
13 very fast when one is arrested, and the
14 arraignment happened fairly quickly.
15          Ms. Barrington is of local counsel
16 in Chillicothe, which is about 15 minutes north
17 of Pike County, where my arraignment was
18 supposed to be held.
19          None of my members of my team were
20 privy to have availability on their schedule to
21 attend the arraignment, which was within a
22 couple of days, if not, I think, the next day,
23 couple of days after my surrender.
24          So it was recommended that we find
25 local counsel to act as stand-in counsel.

Page 107

1 Ms. Barrington came with high recommendation,
2 and she stood in as local counsel. And she
3 joined our team at that moment.
4     Q.    Okay. So who do you believe -- and
5 I mispronounced her name. I apologize.
6     A.    No, that's okay.
7     Q.    Who do you believe Deborah spoke
8 with regarding your criminal prosecution?
9     A.    Ms. Barrington told me that she
10 spoke with, at the time, Assistant Attorney --
11 Prosecuting Attorney Mike Davis.
12     Q.    And what did she tell you -- strike
13 that.
14          Can you paraphrase the conversation
15 that she stated to you she had with the
16 assistant prosecutor?
17     A.    Certainly. So the cell phone had
18 been seized by Captain Burchett --
19     Q.    Uh-huh.
20     A.    -- shortly after my arraignment.
21 Two different buildings, of course. So we got
22 the -- the arraignment happening down in county
23 court, which is in a separate building in
24 downtown, and then we've got the courthouse,
25 which is where the federal -- or, excuse me --

Page 108

1 the felony trial is taking place in the common
2 pleas.
3          So I leave the county court, and I
4 go down to the county courthouse to resume my
5 reporting of the news trial. And specifically
6 to ask for my laptop, because it was no longer
7 online at that time. And I had not been served
8 a copy of a receipt of a search warrant, so I
9 was unaware that it had been seized.
10          The cell phone was seized by
11 Mr. Burchett. And it was quite an ordeal, a
12 very traumatizing experience to get a
13 replacement cell phone through my phone carrier
14 and have my number ported over.
15          So for a number of days after the
16 cell phone seizure, I was operating on a
17 brand-new phone that I had to purchase from my
18 phone carrier on a temporary phone number.
19          Eventually, after much headache and
20 explaining to the phone carrier what had
21 happened, they were able to port my cell phone
22 number from the seized device into the new
23 device.
24          Once that happened, my phone started
25 to populate with numerous text messages from

Page 109

1 various individuals. One of those individuals
2 in text message was Ms. Barrington, who said, I
3 have some news. Give me a call.
4          I called her. Of course, this is
5 two -- I'd say about two to three weeks later
6 after the arraignment and the seizure of the
7 cell phone. And she says, oh, I just wanted to
8 let you know -- and I'm paraphrasing. I just
9 want to let you know I spoke to Mr. Davis, who
10 is the assistant prosecuting attorney in your
11 case. He's heir apparent to become prosecutor
12 in January.
13          He pulled me aside during the
14 arraignment -- after the arraignment, after you
15 left, and said that he has no intention on
16 pursuing this charge to the grand jury when he
17 takes office in January.
18     Q.    But he was not the county prosecutor
19 at the time of that conversation, correct?
20     A.    That's correct. He was the
21 assistant prosecuting attorney and heir
22 apparent to the position.
23          He was charged with the criminal
24 prosecution of cases within the county court,
25 which is where the arrangement took place. And

Page 110

1   that is why he was present that day on behalf
2   of the prosecutor's office.
3       Q.   Going back to your earlier
4   testimony, you stated that the recordings of
5   Jake Wagner, the two day -- two days of the
6   recordings, were on a laptop that has since
7   broke, correct?
8       A.   Yes, that's what I said.
9       Q.   So in October of 2022, did you have
10  two separate laptops?
11      A.   October of 2022?  Was that the same
12  month of the trial?  I'm sorry.
13      Q.   That was the month of Jake Wagner's
14  testimony.
15      A.   Yeah.  So the company and myself had
16  various laptops.  I, personally, had my laptop.
17          We had a laptop we were leasing
18  for the purposes of the trial only, because we
19  didn't want to expend several thousand dollars
20  to purchase a laptop.
21          So for the purposes of the trial, it
22  was much more affordable for us to pay -- I
23  think it was like 15 bucks or something a week
24  for the purpose of the trial, with the intent
25  to return the laptop at the end of the trial.

Page 111

1   So we were just leasing a laptop.  And then I
2   had my laptop.
3           My associate editor had his laptop.
4   My sales representative had her laptop.  And
5   then I imagine we probably had an extra laptop
6   or two around the office, as we normally do.
7       Q.   So the laptop that was seized was
8   the one that you were renting for approximately
9   15 bucks a week, correct?
10      A.   Yeah.  And, again, the purpose was,
11  we needed -- I could not always be present at
12  the courthouse for things.  I would either need
13  to step out to the bathroom or go run an errand
14  or something.
15          I took this case very personal, the
16  case of -- the Wagner case, because I had been
17  following it from the very first day that it
18  happened.
19          I wanted to be present for the
20  trial.  I didn't want to hire outside help to
21  come in.  I wanted to be a part of this very
22  historic trial.  So I made the decision to task
23  myself with being the person who would be
24  present.
25          But I could not tie up my laptop,

Page 112

1   because I would need my laptop after hours to
2   conduct my personal business, to conduct work
3   after hours.
4           The way that our systems were set up
5   within the media room, it just was not
6   conducive to unplug everything.
7           So I made the decision to -- we
8   could either purchase a MacBook laptop in the
9   range of 2-, $3,000, or we could lease one for
10  a few weeks.
11      Q.   And that was leased through
12  RENT-2-OWN, correct?
13      A.   That's correct.  So I made the
14  decision, instead of dropping $3,000, that we
15  would expend a few hundred dollars and lease
16  the laptop for the purposes of the trial.
17          And we -- I made that decision.  And
18  that laptop was placed in the media room to be,
19  what we'll call, master control of the feed
20  that would then feed to the internet and to the
21  viewers back home on social media.  And that
22  was the laptop that was seized.
23      Q.   The recordings of Jake Wagner's
24  testimony that you received were only uploaded
25  to your personal laptop, correct?

Page 113

1       A.   It -- you know, personal, company
2   laptop, whichever you want to label it as, it
3   was one and the same.  I used it for work.
4           I would, you know -- who owned
5   possession of the laptop would be up for
6   debate.
7       Q.   It was not the laptop that you were
8   using that was being rented through RENT-2-OWN?
9       A.   That is correct.
10      Q.   Okay.
11      A.   We needed a second computer.  I
12  needed access to my primary computer.  And then
13  we also needed to have a stationary computer
14  for the feed.
15      Q.   When you published the article on
16  Scioto Valley Guardian's website and Scioto
17  Valley Guardian's Facebook page, did you upload
18  that from the computer that was being rented or
19  the other computer, be it your personal or
20  company laptop?
21      A.   Probably -- I don't recall.
22      Q.   Okay.  You knew, when you received
23  the recording of Jake Wagner's testimony, that
24  he had opted out of being filmed, recorded,
25  videotaped, and photographed, correct?

Page 114

1    A.    I believe I've already answered
2  that, but yes.
3    Q.    And you knew when you published the
4  recording, that Jake Wagner had opted out of
5  being filmed, recorded, videotaped, and
6  photographed, correct?
7    A.    That is correct.
8    Q.    And you published that recording
9  anyway, correct?
10    A.    Under the Privacy Protection Act, I
11  was allowed to do so, and I did so.
12    MS. SARK:  I have no further
13  questions.
14    MR. ROBINSON:  We'll read.
15    MS. SARK:  And I'll go ahead and
16  order the transcript.
17
18
19    DEREK J. MYERS
20
21    - - -
22  DEPOSITION ADJOURNED AT 2:58 P.M.
23    - - -
24
25

Page 115

1    C E R T I F I C A T E
2
3  STATE OF OHIO    :
        : SS
4  COUNTY OF HAMILTON :
5
6    I, Tracy L. Allen, RPR, RMR, the
7  undersigned, a duly qualified and commissioned
8  notary public within and for the State of Ohio,
9  do certify that before the giving of his
10  deposition, DEREK J. MYERS was by me first duly
11  sworn to depose the truth, the whole truth and
12  nothing but the truth; that the foregoing is
13  the deposition given at said time and place by
14  DEREK J. MYERS; that I am neither a relative of
15  nor employee of any of the parties or their
16  counsel, and have no interest whatever in the
17  result of the action.
18    IN WITNESS WHEREOF, I hereunto set my
19  hand and official seal of office at Cincinnati,
20  Ohio, this 1st day of October 2024.
21
22
    Tracy L. Allen, RPR, RMR
23    Notary Public - State of Ohio
    My commission expires July 29, 2028.
24
25

Page 116

1    E R R A T A  S H E E T
2    DEPOSITION OF: DEREK J. MYERS
      TAKEN: SEPTEMBER 18, 2024
3
4  Please make the following corrections to my
  transcript:
5
6  Page  Line Number        Correction Made
7
8
9  None
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Witness Signature        Date        10/7/24

